## GLOBE COTTON MILLS v. NATIONAL LABOR RELATIONS BOARD.

### No. 8797.

Circuit Court of Appeals, Fifth Circuit.

March 30, 1939.

Lansing B. Lee and Wm. P. Congdon, both of Augusta, Ga., for petitioner.

Charles Fahy, Gen. Counsel, National Labor Relations Board, Robert B. Watts, Associate Gen. Counsel, National Labor Relations Board, and Ernest A. Gross, Atty., National Labor Relations Board, all of Washington, D. C., for respondent.

Before FOSTER, SIBLEY, and Mc-CORD, Circuit Judges.

SIBLEY, Circuit Judge.

The order of the National Labor Relations Board, which the Globe Cotton Mills seeks to set aside and which the Board by cross-petition seeks to enforce, requires that the mill and its officers and agents cease and desist (a) from in any manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing and to engage in collective bargaining or other mutual aid and protection as guaranteed by Section 7 of the Act, 29 U.S.C.A. § 157; (b) from refusing to bargain collectively with Textile Workers Organizing Committee as the exclusive representative of all its production employees; and to take affirmative action (a) upon request to bargain collectively with the Textile Workers Organizing Committee with respect to rates of pay, hours of employment, and other conditions of employment, and if an understanding is reached on any such matters, embody said understanding in an agreement for a definite term to be agreed upon, if requested to do so by the Union; (b) to post notices to employees in conspicuous places for thirty days stating that the Mills will cease and desist as aforesaid.

The Globe Cotton Mills justly complains of the first paragraph of the "cease and desist" order and of the requirement that it post notices that it will cease and desist accordingly, because it was not charged in the complaint with having interfered with its employees in any manner, and because the evidence shows affirmatively that it has never discouraged

their joining a union or choosing representatives for collective bargaining. The sole ground of the complaint was that it had refused to bargain collectively with the Textile Workers Organizing Committee, which refusal is the subject of the second paragraph of the "cease and desist" order. The order of the Board is analogous to an injunction or restraining order, and may not be rightly issued by the Board or enforced by this Court touching a matter not complained of or as to which the evidence shows neither a past nor a threatened wrongdoing. Securities & Exchange Commission v. Torr, 2 Cir., 87 F.2d 446; Teller v. United States, 8 Cir., 113 F. 463. The required notice emphasizes and aggravates the injustice, for the promise therein to desist implies an acknowledgment that the Mills had done what they have not done. Paragraph (a) of the "cease and desist" order must be eliminated.

The real contention is whether there was since July 27, 1937, a refusal to bargain collectively in good faith with the Textile Workers Organizing Committee as found by the Board. It is conceded for the purposes of this case that the Board has jurisdiction, and that on and since the date stated the Committee was the chosen representative of a majority of the employees. On May 19, 1937, two persons, known to the Mills' president and known by him not to be employees, obtained an interview with him, claimed to represent the Committee and the employees, and presented a contract for consideration. The president refused to treat with them, or to read the contract, and said he would not bargain collectively. It was proven by Nance, the Committee's Southern director, that the cards signed by the individual employees to designate the Committee as their representative were signed in the main in June and July, some in August. It thus appears that in May the Committee was not in fact authorized to represent a majority of the employees. On June 8, the Mill wrote the Regional Director of the Board: "We stand ready at all times to meet with our employees, individually and collectively, in person or through their representatives. We see no need of a formal election to determine by secret ballot or otherwise who is to represent our employees in collective bargaining. * * * We will at all times be willing to discuss and bargain with them about all matters concerning our mutual welfare." On July 10, on assurances from the Regional Director that Textile Workers Organization Committee had authority from a majority of the employees, the Mills by letter expressed a willingness to meet the Committee for the purpose of bargaining collectively. At the first meeting on July 27 the Committee submitted a written contract which it said was that generally used in the cotton mills throughout the country, but subject to modification in special regions or circumstances. There was a lengthy and friendly discussion of it, and the contract was taken under advisement by the representatives of the Mills. On August 3 the conference was resumed. The Mills submitted a written criticism of each section of the contract. The main section proposing a raise of 15% in wages, and a shortening of the work week from fifty to forty hours was stated to be beyond the financial ability of the Globe Mills, which was a small and handicapped mill, mortgaged to secure running capital, and often unable to obtain orders at prices based on present costs. The section about seniority it was stated set forth in general the practice of the Mills, but that judgment was exercised in particular cases in view of age, family circumstances, and the like, and the Mills could not bind itself to the rigid rule proposed. The section against child labor was useless as no children were employed and the Georgia law forbade it. Other sections promising good faith and cooperation touching legislation were thought without practical value. After long discussion no basis of agreement was found. The conferees separated with a request from the Mills that the Committee modify some of its proposals, and with a promise to submit the report of the meeting to the president, who was absent. On Sept. 28 a third conference was held in which the Committee submitted a contract substantially like the first except that it was proposed to raise the pay 25% and that the Mills should deduct union dues from the employees' pay and remit them to parties to be designated by the Committee. These changes were strongly rejected, and the temper of the conference became strained. The Committee asked for a counter proposal, and the Mills' representatives said in substance that the matters of wages and deduction of Union dues could not be met, that pursuant to an agreement with employees made in the preceding April the Mill was on a forty hour week so long as orders could be got on that basis, that the hard and fast seniority provision was unacceptable, that child labor was prohibit-

ed by law and had no place in an agreement, and that on the whole there did not seem to be any basis for an agreement that would be helpful to the Mills or the employees in the present business conditions. No specific counter proposal was made by the Mills, though requested by the Committee. The Committee then complained to the Board that the Mills refused to bargain.

Section 8(5) of the National Labor Relations Act, 29 U.S.C.A. § 158 (5), declares it an unfair labor practice within the jurisdiction of the Board for an employer "To refuse to bargain collectively with the representatives of his employees, subject to the provisions of Section 9(a) [section 159(a) of this title]." The latter section provides that the subject matter of collective bargaining is rates of pay, wages, hours of employment, or other conditions of employment. A refusal to bargain about legislative policies, and other generalities is not included. As pointed out in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, the Act does not compel agreements between employers and employees, but commands free opportunity for negotiation as likely to bring about adjustments and agreements which will promote industrial peace. The only compulsion to agreement is the possibility of strike by dissatisfied employees on the one side, or inability to continue business and afford any employment at all on the other. We believe there is a duty on both sides, though difficult of legal enforcement, to enter into discussion with an open and fair mind, and a sincere purpose to find a basis of agreement touching wages and hours and conditions of labor, and if found to embody it in a contract as specific as possible, which shall stand as a mutual guaranty of conduct, and as a guide for the adjustment of grievances. It is true that in a small mill like the Globe, having only from 125 to 225 employees, who are personally known to the managing officers and regarded somewhat as a great family, the need for such a contract is much less than in larger industrial units. In the Globe Mills it appears that there were in fact no labor grievances and had not been, that the only request of employees had been for a forty hour week like other mills, which had been promised when practicable, and granted when and for so long as orders could be got on that basis. The Mill, however, actually, was running at a loss on

them. The Mills' officials, we think, sincerely believed there was no occasion for a contract, and that the Committee were interfering from the outside. But the Committee are conceded to have the authority since July 10, 1937, to represent the employees, and they request a contract, and the law makes no exception in favor of a small mill; so that the duty is on the Mills to join in formulating one to which both can agree, fixing as definitely as possible, and for such time as may be agreed on, wages, hours, and conditions of employment, whether on the present basis or a new one. We are of opinion that the evidence does not show a wilful refusal on the Mills' part to do this. The transaction in May between the president and persons who turn out not to have then been authorized representatives ought not to be considered at all. See National Labor Relations Board v. Columbia E. & S. Co., 59 S.Ct. 501, 83 L.Ed. ——. On better advice as to the law and on a sufficient assurance as to the authority of the persons dealt with, his negotiations should be considered as beginning in July. A formal counter-proposal to embody in a contract the Mills' then established wages and hours, (with its outstanding promise as to shorter hours), and its established policy as to child labor, and seniority subject to circumstances, would have put beyond question the Mills' willingness to comply with the Act, 29 U.S.C.A. § 151 et seq. But a counter-proposal is not indispensable to a bargaining, when from the discussion it is apparent that what the one party would thus offer is wholly unacceptable to the other. Cf. National Labor Relations Board v. Sands, 58 S.Ct. 508, 83 L.Ed. ——. Still when a counter-proposal is directly asked for, it ought to be made, for the resistance in discussion may have been only strategy and not a fixed final intention. Because of the refusal on the part of the Mills to make any proposal for an agreement touching wages, hours, and conditions of employment, we will uphold and enforce that part of the order of the Board which requires affirmative action as follows: That the Globe Mills, "upon request bargain collectively with the Textile Workers Organizing Committee as the exclusive representative of all its production employees, except supervisory and clerical employees, with respect to rates of pay, hours of employment and other conditions of employment, and if an understanding is reached on any such matters embody said under-

standing in an agreement." Except as just stated the order is set aside and refused enforcement.