### NATIONAL LABOR RELATIONS BOARD v. HIGHLAND PARK MFG. CO.

No. 4564.

Circuit Court of Appeals, Fourth Circuit.

March 11, 1940.

634

Charles A. Horsky, Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Allen Heald and Malcolm S. Mason, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Whiteford S. Blakeney, of Charlotte, N. C. (Guthrie, Pierce & Blakeney, of Charlotte, N. C., on the brief), for respondent.

Before PARKER, SOPER and DOBIE, Circuit Judges.

PARKER; Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board based on a finding that respondent refused to bargain collectively with a labor union representing its employees. Respondent was ordered to cease and desist from refusing to bargain collectively with the union and from interfering with its employees in the exercise of the rights guaranteed them by Sec. 7 of the National Labor Relations Act, 29 U.S.C.A. § 157; upon request by the union, to bargain with it as the exclusive representative of employees; and to embody in a signed agreement any matters upon which 'an understanding might be reached. The order was entered May 26, 1939, in a proceeding commenced in August 1937, upon petition of the union, which was shown at the time of the filing of the petition to represent 80 to 85 per cent of respondent's 1,000 to 1,100 employees. Petition for enforcement was filed with this Court October 12, 1939, and was set for hearing at the January term 1940. On December 29, 1939, respondent filed a motion with the Court that the cause be remanded to the Board to take additional evidence for the purpose of ascertaining whether the union still represented a majority of respondent's employees. Three questions are presented for our consideration: (1) Whether the findings of the Board are supported by substantial evidence; (2) whether the order of the Board is proper; and (3) whether the cause should be remanded for the taking of additional testimony.

On the question as to whether the order is supported by substantial testimony, there is evidence tending to establish the following facts: Late in May 1937 the union, having attained the right to represent 80 to 85 per cent of respondent's non-supervisory production and maintenance employees, requested and was granted an opportunity to confer with the officers of respondent. At this conference the union representatives submitted a draft of contract as a basis for negotiations, but no conclusions were reached and a second conference, held about ten days later, was cut short as a result of the illness of respondent's president. Conferences were held on June 15 and 25, but the proposed contract was not read or discussed, and respondent's vice-president took the position that it had complied with the requirement to bargain collectively in as much as its mill superintendent had conferred with the union's shop committee concerning several specific grievances. At a meeting on July 27 the union's representatives made an effort to have the provisions of the proposed contract discussed, but failed, and no counter-proposals were made.

On August 4, 1937, another meeting was had. The representatives of the union presented a modified draft of its proposed contract providing for a smaller wage increase than it had originally sought, abandoning an earlier provision that new employees join the union as a condition of employment and providing for the enforcement of the contract's provision against strikes by the discharge and expulsion from the union of employees advocating violation of

contract. Respondent's officers at first declined to enter into a detailed discussion of the union's proposals, and insisted that it had already satisfied the requirements of the law by meeting with the union committees. When the union's representatives stated that they would resort to action before the Board, respondent's officers agreed to discuss the union's proposals seriatim. The proposed contract was then read, and respondent disposed of most of its substantive provisions with the statement that it was already following the practices provided for and intended to continue to do so, but would not enter into any agreement with regard thereto. The proceedings of the meeting are more fully described by the Board in its findings as follows:

"The first paragraph of the draft involved the fixing of a term for the operation of the contract. The respondent's representatives were unwilling to accept such a provision. However, there was little discussion upon the subject, for the union representatives were anxious to reach and have considered the more important substantive provisions. The second paragraph, setting forth that the parties would preserve harmonious relations and protect 'the interest of the textile industry' occasioned little comment. The discussion then turned to the section providing for a workweek of 40 hours, and a workday of 8 hours, and for an increased rate of compensation for overtime work. The respondent's president, C. W. Johnston, stated that the respondent already was operating on a 40-hour week, 8-hour day basis and proposed to continue doing so, that its employees were not and would not be required to work overtime, that, consequently, there was no need for an agreement upon these matters. With respect to the provision for observance of Labor Day, Thanksgiving Day, Christmas Day, and Fourth of July, and the payment of compensation at the rate of 'time and one-half' for any work performed on those days, the respondent's representatives stated that the respondent, as a matter of practice, had always granted its employees holidays, that it had no objection to allowing these holidays if the 'employees wanted them,' but it 'didn't care to agree to the section * * * as a stipulation to be put into effect as a regular thing.' A like position was taken by the representatives regarding a provision prohibiting the employment in the mills of any person under 16 years of age. They contended that the state law prohibited such employment, that the respondent was not employing persons below that age and would not do so, that, therefore, an agreement concerning that matter was unnecessary. Similarly, a provision for settling through arbitration questions concerning 'work loads, proper distribution, or reclassification' was set aside, because 'there is no use trying to find trouble and arbitrate some conditions that don't exist.' Provisions for an increase in wage rates, for a 'preferential shop' and check-off, were flatly rejected. Concerning the requested wage increase, the respondent's representatives contended that 'competition would not allow us to raise wages.'

"Throughout the August 4 conference, the respondent's representatives stressed the fact that while the respondent was always ready to confer with union committees on employee grievances, the respondent had no intention of entering into an agreement or signing a contract with the union. The respondent's president, C. W. Johnston, was emphatic in this. In connection with a provision of the proposed contract embodying the principle of seniority for increases and reductions of working force, a principle which the respondent's representatives asserted the respondent had followed in the past and would adhere to in the future, Johnston was expressly asked by the union representative, Lawrence, 'Will you agree to this seniority provision?' Johnston replied, 'I am not going to agree to a thing.' At the hearing Johnston testified that his reply to this question was, 'I would not sign anything'; that 'Mr. Brewer and Mr. Lawrence (union representatives) insisted on signing a contract which I stated I would not sign it because the law didn't require me to do it and I had no idea of signing a contract.' While Johnston's testimony in terms refers only to the signing of a collective contract and not to the making of an agreement, we are satisfied, and find, upon the foregoing facts and the record, including the circumstances mentioned below, that the respondent had no intention whatsoever of entering into any collective agreement, written or oral, with the union, and did so inform the union representatives.

"At what proved to be the end of the conference, the union representatives, 'for the purpose of determining * * * whether or not it was possible to bargain at all' with the respondent, inquired of

Johnston whether the respondent would be willing to make an oral agreement with the union covering merely some of the provisions of the proposed contract, 'enough of (the union's) * * * requests' to satisfy both the union and the respondent, and then to post in the respondent's mills a written statement of the terms thereof as a 'statement of policy,' signed by Johnston. The union representatives indicated, as an inducement to such action, that the union would be willing to have the statement unsigned by it. Johnston replied that the respondent would make no agreement with the union, even under those conditions. The union representatives then asked whether the respondent would do so if the respondent's superintendent rather than Johnston were to sign the statement of policy. Johnston's reply was again in the negative. Finally, he was asked whether the respondent would make such an agreement and merely have its superintendent read to the employees an unsigned written statement thereof as a statement of policy for the ensuing year. Johnston answered that the respondent would not do so, and the conference thereupon ended."

On August 15 another conference was held, at which the Southern director of the Textile Workers Organizing Committee took the matter up with officers of respondent without result.

The Board summarized its findings and conclusions on the evidence relating to refusal to bargain as follows:

"The attitude and position of the respondent toward collective bargaining with the union may be epitomized as follows: The respondent recognized the union as the exclusive collective bargaining representative of its production and maintenance employees; it was willing to meet with the union whenever the union wished; it was ready to confer about employee grievances. Furthermore, with respect to requests of the union which involved no substantial changes in existing conditions, the respondent was willing to give assurance that it intended no change in such conditions. This was its response to the provisions of the proposed contract involving the existing workweek, holidays, employment of minors, and seniority. However, the respondent was adamant in its stand that it would not enter into any contractual relationship with the union irrespective of what terms the union proposed or what un-

derstanding was reached, that it would not render legally obligatory any assurance given or understanding had with the union, nor would it memorialize by or integrate into a written instrument, signed or unsigned, any such assurance or understanding, or any agreement entered into with the union. In view of this resolve of the respondent, and in the light of the entire record, we are convinced that the respondent had no intention to consider sincerely requests of the union involving material departures from existing conditions.

* * *

"Manifestly, the respondent has not fulfilled its duty to bargain collectively with the union. The attitude and position which its representatives assumed at the August 4 conference clearly show that the respondent was not then negotiating, nor did it intend to negotiate, in good faith with the representatives of its employees. Although good faith demanded that the respondent, in entering the conference, accept fully the procedure of collective bargaining the respondent was not ready to do this. From the outset its intention and purpose were to make no binding agreement with the union, irrespective of what terms were proposed or understanding reached. Equally it was determined, regardless of the request of the union therefor, to refrain from making or signing a written memorial of any agreement reached with the union, or from integrating into a signed written agreement any understanding had with the union. We see no persuasive reason, nor has the respondent advanced any, for its unwillingness to enter into any signed agreement with the union.

"Lastly, as we have found, the respondent had no sincere desire to explore the possibility of reaching even an understanding upon those requests of the union which involved material changes in existing conditions. It first undertook consideration of the provisions of the proposed contract after the union representatives threatened resort to the Board. The provision for increased compensation for overtime work on workdays and holidays was rejected on the bare assertion that its employees would not be required to work overtime. As a matter of fact, subsequent to August 4 the employees were required to work overtime for which they were compensated at the regular rate. Throughout, the action of the respondent's representatives on issues

was dominated by its intent to make no contract.

"We find that the respondent by refusing on August 4, 1937, and at all times thereafter, to enter into any agreement with the union irrespective of what terms might be proposed by or understanding had with the union, to reduce to or merge in a signed written agreement any oral understanding or agreement that might be had with the union, and/or to consider sincerely the requests presented by the union, as aforementioned, did on said August 4, 1937, and at all times thereafter refuse to bargain collectively with the union as the representative of its employees in the appropriate unit in respect to rates of pay, wages, hours of employment, and other conditions of employment. We also find that by such refusal the respondent has interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed by Section 7 of the Act."

We agree with the Board that the conduct of respondent as embodied in these findings, which are supported by substantial testimony, amounted to a refusal to bargain collectively with the union within the meaning of the National Labor Relations Act. The requirement to bargain collectively is not satisfied by mere discussion of grievances with employees' representatives. It contemplates the making of agreements between employer and employee which will serve as a working basis for the carrying on of the relationship. The act, it is true, does not require that the parties agree; but it does require that they negotiate in good faith with the view of reaching an agreement if possible; and mere discussion with the representatives of employees, with a fixed resolve on the part of the employer not to enter into any agreement with them, even as to matters as to which there is no disagreement, does not satisfy its provisions. "The Act contemplates the making of contracts with labor organizations. That is the manifest objective in providing for collective bargaining". Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 236, 59 S.Ct. 206, 220, 83 L. Ed. 126. "The legislative history of the Act goes far to indicate that the purpose of the statute was to compel employers to bargain collectively with their employes to the end that employment contracts binding on both parties should be made". National Labor Relations Board v. Sands Mfg. Co.,

306 U.S. 332, 342, 59 S.Ct. 508, 513, 83 L. Ed. 682.

The duty imposed by the statute was well expressed by Judge Sibley, speaking for the Circuit Court of Appeals of the 5th Circuit in Globe Cotton Mills v. National Labor Relations Board, 5 Cir., 103 F.2d 91, 94, as follows: "We believe there is a duty on both sides, though difficult of legal enforcement, to enter into discussion with an open and fair mind, and a sincere purpose to find a basis of agreement touching wages and hours and conditions of labor, and if found to embody it in a contract as specific as possible, which shall stand as a mutual guaranty of conduct, and as a guide for the adjustment of grievances."

And what was said by the Circuit Court of Appeals of the 3d Circuit in National Labor Relations Board v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713, 723, is applicable here. The Court said: "Respondent failed utterly to discharge its duty to bargain with the Lodge, as the representative of the majority of its employees, in good faith. It is clear that the respondent at no time during its negotiations with its employees entertained any intention of entering into an agreement with the Lodge as the bargaining unit, as provided by the National Labor Relations Act. It is obvious that an employer who enters into negotiations with a labor union representing his employees, with his mind hermetically sealed against even the thought of entering into an agreement with the union, is guilty of refusing to bargain collectively with the representatives of his employees in good faith, as required by the Act, and is therefore guilty of an unfair labor practice. The studied and meticulous efforts of the respondent, in the course of its negotiations with its employees, and in its relationship with its own dominated union, to be 'within the law,' tell their own story. Duties imposed by law cannot be discharged by offering shadow for the substance."

Respondent's repeated declaration that it would sign no written agreement with the union is a pertinent circumstance for consideration on the issue of refusal to bargain. It is argued that since no agreement was reached between respondent and the union there was nothing to put in writing; but the attitude of respondent towards signing a written contract was of a piece with its refusal, as found, to make even an oral agreement regarding matters as to

which there was no real disagreement. Both arose out of a determination not to enter into real collective bargaining with the union. If some valid reason had been advanced for unwillingness to reduce agreements to writing, this conclusion would not necessarily follow; but in the absence of explanation, it clearly indicates respondent's hostility to the whole process of collective bargaining.

 The purpose of the written trade agreement is, not primarily to reduce to writing settlements of past differences, but to provide a statement of principles and rules for the orderly government of the employer-employee relationship in the future. The trade agreement thus becomes, as it were, the industrial constitution of the enterprise, setting forth the broad general principles upon which the relationship of employer and employee is to be conducted. Wages may be fixed by such agreements and specific matters may be provided for; but the thing of importance is that the agreement sets up a modus vivendi, under which employer and employee are to carry on. It may be drawn so as to be binding only so long as both parties continue to give their assent to it; but the mere fact that it provides a framework within which the process of collective bargaining may be carried on is of incalculable value in removing the causes of industrial strife. If reason and not force is to have sway in industrial relationships, such agreements should be welcomed by capital as well as by labor. They not only provide standards by which industrial disputes may be adjusted, but they add dignity to the position of labor and remove the feeling on the part of the worker that he is a mere pawn in industry subject to the arbitrary power of the employer.

The importance of the trade agreement in the process of collective bargaining is universally recognized by economists. John R. Commons and John B. Andrews, Principles of Labor Legislation (1937) p. 129; R. F. Hoxie, Trade Unionism in the United States (1923) p. 269; Twentieth Century Fund, Labor and the Government p. 337; Dale Yoder, Labor Economics and Labor Problems (1933) p. 439; William H. Kiekhofer, Economic Principles, Problems and Policies (1936) pp. 153, 154, 229; Summer H. Slichter, Annals of the American Academy, vol. 178, p. 116; Selig Perlman in the Encyclopedia of the Social Sciences vol. VII, pp. 667 et seq.; Ralph F. Fuchs in the Encyclopedia of the Social Sciences vol.

IV, p. 629, 631; J. B. S. Hardman in the Encyclopedia of the Social Sciences vol. IV, p. 621; Walton H. Hamilton in the Encyclopedia of the Social Sciences vol. II, p. 628 et seq. The author last cited has this to say of the nature of the trade agreement: "The process of collective bargaining results, not in a labor contract, but in a trade agreement. This imposes no obligation upon the employer to offer or upon the laborers to accept work; it guarantees neither to the employers workmen nor to the laborers jobs. It is nothing more than a statement of the conditions upon which such work as is offered and accepted is to be done. The contract of employment is still between the individual employer and the individual employee, though the provision of the order in which men are to be taken on and laid off may give to or withhold from laborers a chance to dispose of their services. It is through the trade agreement, which is subsumed in the labor contract, that collective bargaining becomes an agency of industrial order."

And that Congress contemplated that collective bargaining should be pursued with the end and aim of arriving at trade agreements, so important to giving labor a proper voice in industry, does not admit of doubt. House Report No. 1147, 74th Congress, 1st Sess. p. 20, says: "As has frequently been stated, collective bargaining is not an end in itself; it is a means to an end, and that end is the making of collective agreements stabilizing employment relations for a period of time, with results advantageous both to the worker and the employer." Senate Report No. 573, 74th Congress, 1st Sess. p. 13, says: "The object of collective bargaining is the making of agreements that will stabilize business conditions and fix fair standards of working conditions."

 In the recent case of Art Metals Construction Co. v. National Labor Relations Board, 2 Cir., 110 F.2d 148, the question was squarely presented to the Circuit Court of Appeals of the 2nd Circuit whether refusal to put an oral agreement with employees in writing constituted a refusal to bargain collectively within the meaning of the Act. In holding that it did, a majority of the Court, speaking through Judge Learned Hand, had this to say: "The argument on this point rests upon the admitted truth that the act does not force the parties to come to any agreement at all; for, although an employer must honestly negotiate with his employees col-

lectively, that is as far as he need go. But if, the argument runs, he is forced to make it a term of any oral agreement that it shall be put into writing, he loses that absolute freedom in negotiation which he had at common law, and which Congress meant to preserve to him. Inland Steel Co. v. N. L. R. B., 7 Cir. 109 F.2d 9. It is indeed true, and for that matter a truism, that a stipulation in an oral contract that it shall be put into writing is one of its terms, and that if an employer must put it in, he is not free pro tanto. But he is no longer wholly free anyway; before the act he was not obliged to bargain with his employees collectively; he was at liberty to refuse to negotiate with them at all, or otherwise than severally. The act impaired that freedom; it meant to give to the employees whatever advantage they would get from collective pressure upon their employer; and the question here is what are the fair implications of that grant. They should include whatever is reasonably appropriate to protect it, and no one can dispute that a permanent memorial of any negotiation which results in a bargain, is not only appropriate, but practically necessary, to its preservation; it is hardly necessary to observe that without it the fruits of the privilege are exposed to the sport of fugitive and biased recollection. The purpose of a contract is to define the promised performance, so that when it becomes due, the parties may know the extent to which the promisor is bound; and it is the merest casuistry to argue that the promisor's freedom to contract includes the opportunity to put in jeopardy the ascertainment of what he has agreed to do, or indeed whether he has agreed to anything at all. The freedom reserved to the employer is freedom to refuse concessions in working conditions to his employees, and to exact concessions from them; it is not the freedom, once they have in fact agreed upon those conditions, to compromise the value of the whole proceeding, and probably make it nugatory."

We agree with the Second Circuit, as to this, rather than with the decision of the Seventh Circuit in Inland Steel Co. v. National Labor Relations Board, 7 Cir., 109 F.2d 9; and we think its decision is in line with what was said by the Fifth Circuit in Globe Cotton Mills v. N. L. R. B., quoted supra. In the case before us, respondent has not merely refused to reduce to writing an oral agreement made with its employees, but, as the Board has found, has refused to bargain in good faith with the union representing them. Its announcement that it would reduce no agreement to writing was merely a circumstance to be considered along with others as indicating an intention not to enter into real collective bargaining with the union. If, however, the fact be, as certain witnesses of respondent testified, that respondent's refusal went merely to the putting of agreements arrived at in writing, this would amount to a failure to comply with the provisions of the Act for the reasons stated by Judge Hand.

■ As to the propriety of the order entered, respondent makes two points: (1) That the Board, not having found against it except on the issue of refusal to bargain collectively, was not justified in ordering it to cease and desist from interfering with the right of self organization guaranteed by section 7 of the Act; and (2) that the order should not have required that any understanding reached as a result of bargaining be embodied in a written agreement. There can be no question, we think, but that a refusal to bargain collectively with representatives chosen by employees amounts to an interference with their right of self organization for the purpose of collective bargaining within the meaning of the Act; and it is interesting to note that the decision to the contrary by the Second Circuit in the Remington-Rand case, National Labor Relations Board v. Remington Rand, 94 F.2d 862, has just been overruled by that court in the recent Art Metals Construction Co. case, supra. To like effect, is the decision of the 9th Circuit in the case of National Labor Relations Board, v. Biles-Coleman Lumber Co., 9 Cir., 98 F.2d 18, 22, 23. And we think it clear that it was proper for the order to forbid generally any interference with the right of self organization and not merely the particular kind of interference covered by the findings of the Board. National Labor Relations Board v. Swift & Co., 7 Cir., 108 F.2d 988. What has already been said sufficiently covers the point as to the requirement that agreements arrived at by negotiation be reduced to writing. Even if there were no obligation originally to this effect, the provision would be proper upon a finding that respondent had refused to bargain, since it is a provision "adapted to the situation which calls for redress". Nation-

640

al Labor Relations Board v. Mackey Radio & Telegraph Co. 304 U.S. 333, 348, 58 S.Ct. 904, 82 L.Ed. 1381. We note that such a provision was approved in the Globe Cotton Mills case, supra, 103 F.2d 91, 94, wherein the Circuit Court of Appeals of the 5th Circuit said: "Because of the refusal on the part of the Mills to make any proposal for an agreement touching wages, hours, and conditions of employment, we will uphold and enforce that part of the order of the Board which requires affirmative action as follows: That the Globe Mills, 'upon request bargain collectively with the Textile Workers Organizing Committee as the exclusive representative of all its production employees except supervisory and clerical employees, with respect to rates of pay, hours of employment and other conditions of employment, and if an understanding is reached on any such matters embody said understanding in an agreement.'"

We do not think that the motion to remand the cause to the Board for the taking of additional testimony should be allowed. Respondent is not faced with conflicting claims as to representation, but raises the question as to the authority of the union to represent its employees as a means of escaping any obligation to bargain at all. In such case it is reasonable to presume that the authority of the bargaining agent continues until the contrary be shown. See National Labor Relations Board v. Remington-Rand, 2 Cir., 94 F.2d 862, 870; National Labor Relations Board v. Biles-Coleman Lumber Co., 9 Cir., 96 F.2d 197, 198; National Labor Relations Board v. Louisville Refining Co., 6 Cir., 102 F.2d 678. And we think that no sufficient showing is made to overcome this presumption. There are filed ten blanket affidavits in general form by employees of respondent, who are not shown to have any particular knowledge of the matters to which they testify, and whose affidavits amount to little more than expressions of opinion of little or no value. This is all except an affidavit by a former president of the union, which fails to set forth any definite information as to the present membership of the union, and thus discounts the whole effort to establish loss of majority representation.

It is reasonable to assume, moreover, that any decline in union membership has been due in large measure to refusal of respondent to bargain with the union as representative of the employees in the manner contemplated by the Act of Congress; and, in such situation, an order requiring respondent to bargain as contemplated by the Act is reasonably necessary to overcome the effect of the interference with self organization resulting from the refusal to bargain. An employer should not be allowed to discredit a bargaining agent selected by an overwhelming majority of his employees by refusal to bargain with it and then take advantage of the loss of membership due to his wrongful act as an excuse for refusing to recognize it as a bargaining agent. It must be remembered that the union represents the employees, not the employer; and, if a majority of the employees are not satisfied to be represented by it, they can apply to the Board for relief. It is significant that, while the affidavits filed before us state that a majority of the employees are not members of the union and that for some time it has not been the designated or selected representative of the majority, there is nothing in them to the effect that the employees are not willing to have it bargain for them. If respondent's refusal to bargain had been due to bona fide belief at the time that the union did not represent a majority, a different situation would, of course, be presented; but it is admitted that at that time the union represented between 80 and 85 per cent of the employees. Under such circumstances, we feel that we should decide the case on the record certified by the Board (National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 60 S.Ct. 203, 208, 84 L.Ed. ——) and leave any question of representation which may have arisen out of changed conditions since the record was made to be dealt with by the Board under the provisions of the Act.

The order of the Board will be enforced.

Order enforced.