INTERNATIONAL ASS'N OF BRIDGE, STRUCTURAL & ORNAMENTAL IRON WORKERS et al. v. PAULY JAIL BLDG. CO. et al.

No. 11644.

Circuit Court of Appeals, Eighth Circuit.

April 1, 1941.

616

Robert J. Keefe, of St. Louis, Mo. (Igoe, Carroll, Keefe & McAfee, of St. Louis, Mo., on the brief), for appellants.

Charles H. Spoehrer, of St. Louis, Mo., for appellees.

Before GARDNER, WOODROUGH, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The question is whether an injunction issued by the district court against a labor union and its officers, in connection with a strike, is sustainable under the Norris-La Guardia Act, Act of March 23, 1932, 47 Stat. 70, 29 U.S.C.A. §§ 101–115, on the ground of fraud.

Section 4 of that Act, 29 U.S.C.A. § 104, prohibits an injunction against, among other acts, "(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence," and "(i) Advising, urging, or otherwise causing or inducing without fraud or violence" other persons to cease or refuse "to perform any work or to remain in any relation of employment."

The district court held that it was a fraud, within the exception in the Norris-LaGuardia Act, for the union to make representations that the employer was unfair in refusing to execute a collective bargaining agreement with it, containing a closed shop provision, for the reason that the union did not represent a majority of the workers, and the employer, in making such an agreement, would be violating the National Labor Relations Act, Act of July 5, 1935, 49 Stat. 452, 453, 29 U.S.C.A. §§ 158, 159.[1] Section 9 of that Act provides that representatives designated or selected by a majority of the employees in a unit appropriate for that purpose · shall be the exclusive representatives, for collective bargaining purposes, of all employees in the unit. Section 8 makes it an unfair labor practice for an employer to refuse to bargain collectively with such designated or selected representatives of his employees, and authorizes the employer, where he is willing to do so, to enter into a closed shop agreement with such an unsponsored and majority-designated labor organization.

A permanent injunction was granted in favor of the employer, forbidding the union and its officers to represent that the employer was unfair in refusing to enter into a collective bargaining agreement, containing a closed shop provision, with the union; prohibiting them from advising or soliciting any one not to work for the employer or for any contractor or builder purchasing or installing its products on the ground that the employer had failed to make such an agreement with the union; barring them from informing any one of their intention not to work for the employer because of its refusal to enter into such an agreement; and proscribing the making of any agreement with any one not to engage in any work for the employer or for any third party using the employer's products, "when such agreement in any manner involves or is based upon the representation by defendants that plaintiffs should make a collective bargaining agreement with defendants."

The Norris-LaGuardia Act does not attempt a definition of the term fraud, but the unmistakable public policy which it declares does not leave room for a mere academic concept, such as may constitute the foundation for ordinary equitable relief. Expressions of opinion, though inaccurate and even misrepresentative in character, obviously cannot be permitted to be made the basis ordinarily for injunctive process in a labor dispute. Wilson & Co. v. Birl, 3 Cir., 105 F.2d 948; Cinderella Theater Co. v. Sign Writers' Local Union No. 591, D.C.Mich., 6 F.Supp. 164. Accusations of unfairness against an employer normally will fall within this category. Nor will an isolated act of incidental conduct support an injunction, simply because it may seem to be lacking in good faith.

The fact must not be lost sight of, that however narrow the scope of injunctive relief may be in form, the issuance of the writ for any purpose in a labor dispute will generally tip the ·scales of the con-

---

[1] The opinion of the trial judge is reported in D.C., 29 F.Supp. 15.

troversy. Plainly this was the very evil against which the Norris-LaGuardia Act was basically directed. In effectuating the purpose of the Act, therefore, the exceptions which have been left open to injunctive process may not be treated lightly, or as if the Act had never been passed, but should be viewed restrainedly, as a narrow field of permissive jurisdiction, exercisable in the interest of a public policy co-ordinate with that aspect upon which the prohibitions of the statute rest.

The dignity of the State has always demanded that certain forms of conduct be not permitted to become the controlling basis for disposing of individual or social controversies. And so, in making "fraud or violence" an exception under the Norris-LaGuardia Act, Congress obviously did not do so because the damages therefrom to any of the parties might·be sharper or more penetrative than from other methods of carrying on the dispute. The statute does not concern itself with the nature or extent of the damages that the parties may sustain from a labor dispute, except to require that there be "substantial and irreparable injury to complainant's property," as a foundation for injunctive process. Since irreparable injury always has been a jurisdictional prerequisite in such a case, the statute added nothing in that respect. What Congress accordingly must be regarded as having intended in the situation was to leave the federal courts free to enjoin those permeative acts, falling within the term "fraud or violence", which an unsluggish public conscience and a healthy social order cannot soundly tolerate, even at the risk of thereby enabling one of the parties to tip the scales of the fundamental dispute.

The suit here involved was instituted by Pauly Jail Building Company, a corporation engaged in manufacturing and installing steel windows and jail equipment, and by Security Products Company, a subsidiary sales corporation for Pauly products, as plaintiffs. The Pauly plant or factory is located at St. Louis, Missouri, and eighty per cent of its products are distributed in interstate commerce. Defendants, who are the appellants here, consist of the American Federation of Labor's general union of workers engaged in fabricating and installing iron and steel products throughout the country, some of the officers and agents of the union, and one of its local bodies or units in whose territorial jurisdiction the Pauly plant is located. The general union has a membership of approximately 45,000. The local union has its separate officers and by-laws but is merely a constituent unit or functioning part of the general union. For any purpose here, it will be unnecessary to distinguish between them, and they may simply be referred to as the union.

In May, 1937, the union concededly represented a large majority of the fabricating or production employees of the Pauly plant, and the employer entered into an agreement with it as the exclusive bargaining agency of such employees, for the period of a year. Before the agreement expired, the union gave notice that it desired some changes on renewal, consisting of a closed shop provision, wage adjustments, classification of employees and seniority recognition. No understanding had been reached, when the original agreement expired. Negotiations and conferences were continued intermittently until September 21, 1938. The employer would not agree to a closed shop, and the union would not recede from its demand. In the deadlock thus created, while the other demands of the union were discussed, no attempt was made to dispose of them.

On September 22, 1938, the union called a strike. The employer admits that the union at that time, as it had in the past, represented a large majority of the production employees. The plant was closed from the date of the strike until the latter part of November, 1938. It was picketed all during this period, and down to the time of the trial in the district court, but without disturbance or violence.

On October 6, 1938, the employer sent out a letter to all employees, declaring, among other things, that the company was willing to make a contract with the union, giving the employees all the rights to which they were entitled under the National Labor Relations Act, but that it could not approve the closed shop proposal, because it would not "coerce any of its employees into joining or not joining a union."

On October 10, 1938, there was another letter from the president, stating that "the company would not now or at any time in the future sign a closed shop contract. * * * A contract of that kind is not fair to employees and I positively will not become a party to a contract which imposes that kind of restriction on employment."

On October 18, 1938, and October 27, 1938, similar letters were sent out, with suggestions that the employees give consideration to the matter of returning to work. On November 25, 1938, there was a further letter, stating that a conference had again been held with the representative of the union, "in an effort to convince him that the Company could not and would not sign a closed shop agreement" and declaring that the plant would reopen on November 29, 1938. The communication added: "We want you to know that as a matter of record, notwithstanding the Company's position to reopen the plant, it is willing at any time in the future to resume negotiations and bargain with the representative of the employees and at the conclusion of such negotiations to enter into an equitable contract with the Union."

On December 23, 1938, the company again wrote its employees, advising them that the plant had been reopened on November 30, 1938, and that one-half of the employees had returned to work, and urging those still on strike to return by December 27, 1938. The letter recited that four conferences had been held with representatives of the union during the month of December, but that the company was unable to grant any wage increases or to accede to the demand for a closed shop. It declared, however: "We have always been and still are ready and willing to sign an agreement with the Union recognizing it as the exclusive bargaining agency for all of the employees of the Company actively engaged in production."

On November 30, 1938, when the plant was reopened, twenty-six production employees, of whom some never had been members of the union, though represented by it for collective bargaining purposes, returned to work. By January 25, 1939, at least five more had yielded. On the trial, the employer showed by its pay-roll records that at the time of the strike there were sixty employees engaged in fabrication or production work, and it contended that by January 25, 1939, thirty-five of these no longer wanted the union to represent them. The evidence on behalf of the union was that, from its conferences with the employer, it understood the plant had fifty-two production employees on September 22, 1938, and that its records showed that twenty-eight of these were still on strike at the time of the trial. The evidence is somewhat unsatisfactory as to the status as of that date of a few of the men who were employees when the strike was called, but it would appear, as the trial court held, that a majority of the employees had abandoned the strike by January 25, 1939.

Whether this circumstance must be held also to have constituted a revocation of the union's right to serve thereafter as their agent for any purpose in collective bargaining is a somewhat different question. The employer contends that a crossing of the picket line by an employee was notice to the union of his repudiation of it for every purpose. But the status of the union as such was not wholly identical with its position as a collective bargaining representative under the National Labor Relations Act. In the latter capacity, it was representing not merely union members, but non-union workmen as well. The National Labor Relations Act did not bind any employee to accept the views of the union as such, but only to abide by the terms of any agreement which the union, as a collective bargaining representative, entered into with the employer. If an agreement were executed which did not truly represent the wishes of a majority of the employees, they were free to remedy the situation for the future, by a revocation of the agency, and, if necessary, an application to the National Labor Relations Board under section 9 of that Act, 29 U.S. C.A. § 159. National Labor Relations. Board v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632.

It cannot therefore be held that a crossing of the picket line and a return to work by individual employees constituted a revocation, as a matter of law, of the union's right to act as the collective bargaining agency of such employees for any purpose. But it is pointed out that a majority of those who returned to work had been members of the union, and that they had not for some time paid their dues or attended union meetings. There was no provision, however, in the union by-laws for an automatic ouster in such a situation, except that, if dues were not paid for a twelve months' period, membership automatically lapsed. Six individuals had thus been removed from the union rolls during the course of the strike. The names of the rest who had been union members at the time the strike began remained upon the books as such. None had ever resigned or requested to have his name stricken. One union member, who had returned to work,

later rejoined the strike. Under the union by-laws, those members who had abandoned the strike might have been subject to discipline or ouster for doing an act "likely to injure the Association or to bring discredit upon it," but this could only be done by preferment of charges, notice and a trial, and no such steps ever were undertaken. And here again, so long at least as a closed shop agreement did not exist, there was a technical distinction between the status of the union as such and its position as collective bargaining agent; which cannot be unconsideredly swept aside.

Under the evidence, whatever may have been the views of the individual employees, non-union or union, regarding the union's demand for a closed shop provision in its collective bargaining agreement with the employer, the evidence does not show that any employee, prior to the institution of this action, ever gave actual notice or made direct expression to the union, or even to the employer of his desire to revoke the union's right to continue to act as the designated or selected collective bargaining agency of the workmen in the plant. Twenty-eight of those who had returned to work were called to the witness stand by the employer and testified in substance that, from the time they resumed their employment, they no longer actually had wanted the union to represent them. Such testimony might, of course, be expected on a trial. No one claimed, however, as we have already indicated, that he had communicated this desire to the officers of the union. Some of them admitted that economic necessity had been a factor in their abandonment of the strike.

■ In distinguishing between the union's status as such and its position as collective bargaining agent, we have done so, not for the purpose of placing any emphasis upon it, but simply to indicate that, in the absence of an express revocation or the designation of a substituted agent, an assumption on the part of the union to act as, or to declare itself to be, the authorized agent of the plant workers for continued negotiation with the employer was certainly not inconsistent with the exercise of good faith, unless the situation was controlled by other circumstances. Presumptively at least, its status as collective bargaining agent continued. National Labor Relations Board v. National Motor Bearing Co., 9 Cir., 105 F.2d 652. And here, the attending circumstances, instead of giving taint to the union's actions in the situation, seem to us completely to remove them from the field of authorized injunctive relief, on practical grounds.

■ The fraud with which the petition charged the union and its officers was that they had "falsely and fraudulently represented and are representing to the public, and the customers and contractors of plaintiffs that said defendants were and are the representatives of a majority of the production employees of said Company, whereas in truth and in fact they did not and do not so represent said workers." The singular thing about this allegation is that the employer had never taken that position, nor made such an accusation, until it had apparently determined to find some way of reaching the effects of the strike through legal action.

The several communications which the employer addressed to the employees of the plant during the progress of the strike, and to which we have previously adverted, repeatedly recognized and confirmed the union's right to act as collective bargaining agent in the situation. As late as December 23, 1938, and after the company claimed that one-half of the employees had abandoned the strike and returned to work, it declared to its employees: "We have always been and still are ready and willing to sign an agreement with the Union recognizing it as the exclusive bargaining agency for all the employees of the Company actively engaged in production." In a counterproposal to the union's demands which the company submitted also in December, 1938, as the basis for an agreement, it again recognized the union's position as the exclusive collective bargaining agency of the employees. Indeed, at all times, both before and after January 25, 1939, which plaintiffs seek to make the controlling date herein, and until it was necessary to formulate a foundational allegation for the institution of this lawsuit, the company had continuously dealt with the union on this unequivocal basis.

The president of the company testified that, from the time of the strike in September, 1938, until this action was commenced in June, 1939, there had been at least twenty-five conferences with representatives of the union, and that: "During all our conferences it was understood that we would agree to recognize them as exclusive bargaining agency for the em-

ployees, up to the time suit was filed." The last conference was held three days before the filing of the petition herein, and at a time when that pleading was apparently already in process of preparation. Even on that occasion, the union representatives were not accused of fraud. The attorney for the company admitted, in the cross-examination of one of the union representatives on the trial, that "at all times during our many conferences together, I stated * * * that the company was ready and willing to recognize your union as the exclusive bargaining agency." He then added this qualification: "I said at all times. That might be qualified in this respect, that with the possible exception of the last meeting held in my office (three days) prior to the filing of this suit. I believe I told you (on that occasion) there might be some doubt about our ability to recognize your union as the exclusive bargaining agency, in view of the fact that there had been some doubt about whether you then represented a majority, but that I would be willing to discuss that with you."

We are unable to see how, in normal human dealings and relationships, the union can justly be accused of fraud in asserting, down to the institution of this suit, that it was the proper bargaining agent of the employees, when the employer all during that period recognized the union's position as such, continuously dealt with it on that basis, and never questioned its authority to act in that capacity. There is no contention that the union deceived the company in the situation. Under these circumstances, what the company voluntarily recognized and admitted to both its employees and the union, and at all times accepted as a basis for continuous mutual negotiation, the union certainly could not be accused of fraud or of unconscionable conduct in declaring to the public. The ground upon which plaintiffs rely for an injunction is therefore within neither the spirit nor the letter of the exception in the Norris-LaGuardia Act.

Part of the charge of misrepresentation upon which plaintiffs relied was in fact grounded in mere implication. Thus, it was the trial court's view that when defendants represented that a strike was in existence because of the employer's refusal to enter into a collective bargaining agreement with the union, containing a closed shop provision, this was a fraudulent implication that "the contract demanded by defendants was one which plaintiffs should properly sign or failing to do so be unfair to organized labor." It is unnecessary, however, to give consideration to this aspect of the matter, in view of the basis of our disposition here.

What plaintiffs really were seeking to do, of course, was to find some means of breaking the secondary boycott which had resulted from the refusal of union labor throughout the country to handle or install Pauly products, or to work on any construction job where it was attempted to install such products with non-union labor. The conclusion would hardly be warranted from the record, however, that this secondary boycott pivoted on whether the union did or did not represent a majority of the production employees after January 25, 1939, but rather it would seem to have been motivated by the simple fact that the union had called a strike. The boycott itself, as the trial court properly held, necessarily could not be reached through injunctive process if there was no fraud or violence by which it was being permeatively generated or supported. Levering & Garrigues Co. v. Morrin, 2 Cir., 71 F.2d 284.

Plaintiffs could accordingly not invoke the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 26 Stat. 209, as amended, as a basis for relief, because in a labor dispute the provisions of that Act are subservient to the limitations of the Norris-LaGuardia Act. Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. ——, United States v. Hutcheson, 61 S.Ct. 463, 85 L.Ed. ——. Under the Norris-LaGuardia Act, the court was without jurisdiction in the present case.

The decree of the trial court must be reversed and the cause remanded, with directions to dismiss the action.

Reversed with directions.

WOODROUGH, Circuit Judge (concurring).

I concur fully in the court's opinion in this case and I agree on the grounds set forth that the labor union ought not have been enjoined from making the representations which it did make in carrying on its labor dispute with the appellees. But in addition to the issues which were sharply contested and which have been carefully considered and decided, I think the record before us also shows that the federal court

had no jurisdiction of the case. The parties are residents of the same state and the only ground of jurisdiction is asserted violation of the Sherman Anti Trust laws as amended. The labor union was attempting by strike, boycott and secondary boycott, to coerce the employer to accede to demands concerning collective bargaining and wage and working conditions. It was not attempting, and did not intend, either by its own effort or in concert with any one else, to effect or foster any monopoly or combination restrictive of competition in a product in commerce or to effect fixing prices thereof, against the public interest of the United States, and whatever rulings federal courts may have made in the past, it seems to me the Supreme Court has now firmly settled that on the facts of this case there existed no "combination in the form of trust or otherwise" and no "conspiracy in restraint of trade or commerce" forbidden by the anti trust laws, and no controversy of federal cognizance.

In Apex Hosiery Company v. Leader, 310 U.S. 469, page 487, 60 S.Ct. 982, page 988, 84 L.Ed. 1311, 128 A.L.R. 1044, the court addressed itself to the specific question "whether a conspiracy of strikers in a labor dispute to stop the operation of the employer's factory in order to enforce their demands against the employer is the kind of restraint of trade or commerce at which the [Sherman] Act is aimed", and the question was answered in the negative. In the later case of United States v. Hutcheson, 61 S.Ct. 463, 464, 85 L.Ed. ——, decided Feb. 3, 1941, where the labor union had attempted to enforce its demands in a labor dispute by means of picketing and local boycott at the place of production, and secondary boycott extended throughout the country, the court said the question was "whether the use of conventional, peaceful activities by a union in controversy with a rival union over certain jobs is a violation of the Sherman Law", and that question is answered in the negative.

The broad ground of both decisions is that in the cases presented the combination and acts of the members of labor unions were directed to the object of labor unionization of a plant and to obtaining jobs

awarded to a rival union and therefore they were not directed to any restraining of trade or commerce to prevent competition therein or to foster monopoly or to effect or foster any trust or like combination to fix prices or to any violation of the anti trust laws.

The decisions do not imply that all strikes and boycotts by labor unions are beyond the reach of the Sherman Act as amended. On the contrary, it is made clear in each case that where labor unions combine upon objects outside of the field of labor relations, "the area of economic conflict" (Hutcheson case, 61 S.Ct. at page 465), or "combine with non-labor groups" (Hutcheson case, 61 S.Ct. at page 466), to effect the objects at which the anti trust laws are directed, then, and then only, they do become amenable to the provisions thereof. The decisions establish that the objects and intent with which those who are combined in labor unions are acting must determine whether their labor union has intruded into the field of the Sherman Act, and on the facts of the cases before the court it found there was no intent to effect the objects at which the Act is aimed. Here the common objects and intent concerned only labor relations. Making misrepresentations about the facts or issues of the labor dispute could not change the concerted attempts to bring about desired labor relations into a conspiracy to effect or foster monopoly or to fix prices. Though the Supreme Court found no occasion to so state specifically in the cases before it, its determination necessarily carries such implication. [2]

As I read the recent decisions they compel the conclusion that there is no violation of the anti trust laws and therefore no federal jurisdiction in this case. Cf. Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738; American Federation of Labor v. Swing, 61 S.Ct. 568, 85 L.Ed. ——, decided Feb. 10, 1941; Carlson v. California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104; Milk Wagon Drivers' Union v. Lake Valley Farm Producers, Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. ——; Milk Wagon Drivers' Union v. Meadowmoor Dairies, Inc., 61 S.Ct. 552, 85 L.Ed. ——, decided, Feb.

[2] Restraints not within the Act when achieved by peaceful means are not brought within it merely because without other differences they are attained by violence. Apex Hosiery Co. v. Leader, supra, 310 U.S. at page 485, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

10, 1941; Stevens & Co. v. Foster & Kleiser, 311 U.S. 255, 61 S.Ct. 210, 85 L.Ed. ——; Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093.