NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

The GENERAL TIRE AND RUBBER COMPANY, Respondent.

No. 19729.

United States Court of Appeals Fifth Circuit.

Jan. 15, 1964.

Morton Namrow, Atty., N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., Washington, D. C., for petitioner.

John Edward Price, Fort Worth, Tex., for respondent.

Before CAMERON, BROWN and WISDOM, Circuit Judges.

CAMERON, Circuit Judge.

This appeal raises the questions whether the Respondent, The General Tire and Rubber Company, failed to bargain in good faith in violation of § 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq., and whether Respondent committed an unfair labor practice by discharging and refusing to reinstate several employees in violation of § 8(a) (3) and (1) of the Act. The National Labor Relations Board has filed this petition to enforce its order of January 15, 1962[1] against Respondent, an Ohio corporation operating a plant in Odessa, Texas.

Respondent began operating this newly built plant in Odessa, Texas in October, 1957, and the facts touching the alleged failure to bargain will be taken up first. The Company's operating procedures, wages and other conditions of employment for hourly personnel were contained in a pamphlet published by the Company known as the Redbook. The Company employed in September, 1957 an industrial relations manager to study and recommend changes in the Redbook. After some study of the Redbook, the manager proposed several changes. However, during this time the Union began organizational activities and the Company felt it would be unwise to make unilateral

1. 135 NLRB No. 28.

changes in the Redbook practices as long as the prospect of bargaining with the Union existed.

January 28, 1960, the International Union of Operating Engineers, Local 826–AFL–CIO, won a Board-conducted election, and it was, on February 5, 1960, certified by the Board as the bargaining representative of the production and maintenance employees and laboratory technicians at the Odessa plant. The parties bargained from March 17 to September 14, 1960, meeting eighteen times without reaching a final agreement.

The Union presented its only written proposal at the opening conference on March 17th, wherein it wanted to change many of Respondent's Redbook practices and also to institute new practices. During the first four meetings the parties discussed the Union's demands, its justification for the demands, and the Company's initial position with respect to the various demands. Beginning April 20th at the fifth meeting, the Company made a series of counter offers to the Union. The Company supported its proposals and arguments with facts which were not in general denied by the Union.

The Company's first proposal sought to maintain its Redbook practices or to reach a compromise between the Redbook and the Union demands. The series of proposals offered by the Company were thereafter discussed in detail by both sides. Following the initial counter-proposals, the Company made numerous written and oral changes in its counter-proposals, adjusting its demands in an effort to reach a form acceptable to the Union. There were thirty-eight instances where Respondent adjusted its proposals in striving to induce the Union to agree. Gradually, the Company lowered its initial proposals, reducing the Red-book benefits until there was only a slight difference between the Redbook and what the Union had originally proposed.

During this negotiation, the Company made numerous concessions[2] to the Union beyond what its Redbook had originally provided. As the result of these discussions, concessions and reasonable arguments, the parties made substantial progress towards reaching an agreement.

Based upon the facts above outlined, the Examiner found that the Company had been guilty of § 8(a) (5) violations, based chiefly upon the Company's refusal to agree to a dues check-off clause in the contract. We do not think the conclusion of the Examiner was justified by substantial evidence. There is no disagreement between the parties as to the applicable law.[3]

On the other hand, the evidence clearly shows, in our opinion, that the employer here did enter and carry on discussions with respect to collective bargaining "with an open and fair mind, and a sincere purpose to find a basis of agreement touching wages and hours and conditions of employment." The Company was no novice in conducting negotiations such as those involved in this record, and neither was the Union. The Company repeatedly stated that it would not agree to a dues check-off clause, contending that the collection of dues was a Union obligation. The Company started out with a written memorandum of its employee relationships as it desired them to be. It retreated from a large number of the provisions of the Redbook. It made counter-proposals both in writing and orally, and discussed fully each and every contention of the Union, throughout making known its attitude with respect to them.

---

2. The Company agreed to such items (among others) as (1) a complete grievance procedure to be concluded by arbitration; (2) a more liberal funeral leave provision; (3) a more liberal qualification period for jury service pay; and (4) to maintain earnings for a week when temporarily transferred.

3. Globe Cotton Mills v. N. L. R. B., 5 Cir., 103 F.2d 91, 94; N. L. R. B. v. Whittier Mills Co, 5 Cir., 111 F.2d 474; N. L. R. B. v. Athens Mfg. Co., 5 Cir., 161 F.2d 8; N. L. R. B. v. Reed & Prince Manufacturing Co., 118 F.2d 874; N. L. R. B. v. Griswold Manufacturing Co., 5 Cir., 106 F.2d 713, 723.

The reduction by the Union of its "must" items from seventy-nine to four shows that it was making use of these items as aids to bargaining, and it is apparent that the Union did not, in most instances, expect to induce the employer to give up its convictions and practices as to them. The same is true of the dues check-off clause.

■ We think that the conclusion of the Examiner that the Company was not open and sincere in its effort to come to terms with the Union is without basis in the evidence. The fact is that the Union is the party which abandoned negotiations and resorted to the coercive device of a strike. The Company, on the other hand, suffered an actual strike, thus emphasizing its honest adherence to the basic principles relied on by it through the bargaining sessions. The Company's willingness to go into actual strike conditions and the contrasting prompt abandonment of the strike tended to demonstrate sincerity on the part of the Company and that the Union was resorting to bluffing tactics throughout the negotiations. We are of the opinion, therefore, that the finding by the Examiner that the Company had refused to bargain collectively in good faith with the Union was not justified by any substantial evidence in the record and was based upon speculation and suspicion.

We think, moreover, that the action of the majority of the Board in affirming the findings and conclusions of the Ex-aminer on this aspect of the complaint was not based upon substantial evidence.

We are impressed with the analysis of the evidence and the conclusions of the dissenting member of the three-man panel, and we reproduce in the margin excerpts from the dissenting opinion.[4]

■ Likewise, we think that the action of the majority of the Board in reversing the findings and conclusions of the Examiner as to the alleged § 8(a)(3) violations were not based upon substantial evidence.

Respondent, earlier in the year and in keeping with its established practice, contracted with the H. B. Stone Construction Company to furnish supplemental labor for construction work in vacation relief. The Union discussed this agreement during the bargaining period, and did not object to it. During the strike the Company contracted with the Dresser Engineers Company for supplemental labor; and when Dresser began furnishing certain temporary manpower, the Respondent and Stone canceled their contract. As a result of the cancellation, five men employed under the Stone contract were not permitted in the plant. About a month after the strike, Respondent informed Dresser that these five men were available for work and, as a result, Dresser employed them.

The General Counsel failed to support the allegations in its complaint, as amended, that Alfredo Do La Cruz Julian Campos, Jose Garcia, Thomas Mo-

4. "First, with respect to my colleagues holding that the Respondent violated Section 8(a)(5) of the Act, I do not believe that the record here warrants finding that the Respondent refused to bargain in good faith. The record shows that representatives of the Respondent and the Union first met on March 17, 1960, and that 17 negotiating sessions were held thereafter. Throughout these sessions the Respondent submitted proposals and counter-proposals in an effort to arrive at a contract. Evidence of the Respondent's good faith bargaining efforts is found in the progress made during these negotiating sessions. For example, at the eighth meeting held on May 24, 1960, the Union presented a list of 79 'must' items, which it maintained had to be included in the contract. Through the give and take of bargaining, the Union's second 'must' list, which was presented at the twelfth session on June 23, 1960, was reduced to 46 items. Through further negotiations, the 'must' list was reduced to 26 items as of the sixteenth session held on September 7, 1960, and the Respondent, at the next meeting held on September 13, 1960, offered to compromise on nine of these items.

"I would find, therefore, that while the bargaining negotiations between Respondent and the Union were hard and long, the Respondent bargained in good faith."

reno, and Jesus Alvarez were discriminated against in violation of § 8(a) (3) when they were denied entrance to Respondent's plant because Respondent had canceled its contract with Stone.

We feel that a majority of the Board was in error when it held that these men were participating in an unfair labor practice strike and were entitled to reinstatement upon their conditional application to return to work. Some of these alleged discriminatees were included within the bargaining unit. It should also be noted that the status of these individuals was established by agreement which the Respondent had with Stone. This agreement provided that Stone, for a stated compensation including wages and overriding percentage, was to furnish Respondent with laborers. Pursuant to this agreement, Stone hired these five men, placed them on his payroll and set them to work at Respondent's plant. While at work they were under the Respondent's control to the extent that they could be discharged.

The Trial Examiner and the Board found these men to be employees of the Respondent. We do not think it necessary to decide this precise issue. The mere act of refusing re-employment is not enough to sustain the § 8(a) (3) charge. Anti-union discrimination is the essential ingredient. There is no evidence that the contract with Stone was used either before or during the strike as an anti-union weapon or a sham. The Stone contract was canceled on September 21, the day before the strike ended. Stone, the immediate "employer" of these five men no longer had any responsibility for supplying labor. If the contract was fully effective to make the laborers employees of Stone, rather than Respondent, the refusal to allow them in the plant was unquestioned. But if, as argued, under the total circumstances the men were for purposes of the Labor Relations Act employees of Respondent, there is nothing to show that failure of Respondent to recognize such "rights" to employment was anything more than a mistaken judgment on what is, at best, a difficult, troublesome legal question for even the most skilled.

There was no evidence in the record that the Respondent's actions resulted from discriminatory motives. It should be noted that the Respondent, after the strike, referred these men to Dresser for similar employment. The petition for enforcement of the Board's order is denied.