**H. J. HEINZ CO. v. NATIONAL LABOR RELATIONS BOARD.**

No. 8187.

Circuit Court of Appeals, Sixth Circuit.

April 3, 1940.

Writ of Certiorari Granted June 3, 1940.

See 60 S.Ct. 1102, 84 L.Ed. ——.

Earl F. Reed, of Pittsburgh, Pa., and Robert Caldwell, of Ashland, Ky. (Caldwell & Gray, of Ashland, Ky., and Thorp, Bostwick, Reed & Armstrong, Robt. T. Caldwell, Earl F. Reed, Roy G. Bostwick, Donald W. Ebbert, and Charles C. Hewitt, all of Pittsburgh, Pa., on the brief), for petitioner.

Philip G. Phillips, of Cincinnati, Ohio (Charles Fahy, Robert B. Watts, and Laurence A. Knapp, all of Washington, D. C., Philip G. Phillips, of Cincinnati, Ohio, and Mortimer B. Wolf, and Solbert M. Wasserstrom, both of Washington, D. C., on the brief), for respondent.

Before SIMONS, HAMILTON, and ARANT, Circuit Judges.

ARANT, Circuit Judge.

This is a petition to review and set aside a final order of the National Labor Relations Board, which directed the H. J. Heinz Company to cease and desist from dominating or interfering with the administration of the Heinz Employees' Association, refusing to bargain collectively with the Canning and Pickle Workers, Local Union No. 325, and interfering with the rights of its employees guaranteed in § 7 of the National Labor Relations Act, 29 U.S.C.A. § 157; and also requiring petitioner to disestablish the Association, bargain collectively with the Union, upon request, embody in written form any understanding reached, if requested to do so by the Union, and post the usual· notices of compliance.

The Board's order is based upon its findings of fact and conclusions of law that petitioner had violated §§ 7, 8 (1), 8 (2) and 8 (5) of the Act, 29 U.S.C.A. §§ 157, 158 (1, 2, 5).

Petitioner contends that the evidence does not support the Board's findings, that some of·its findings do not support the conclusions of law based thereon, and that, in some respects, the order transcends the Board's powers. The Board takes issue and, pursuant to § 10 (e) of the Act, 29 U.S.C.A. § 160 (e), has petitioned this Court to enforce its order.

The Union and the Association began drives for membership among petitioner's employees in April of 1937. The former organization was later chartered by the Amalgamated Meat Cutters and Butcher Workmen of North America, which is affiliated with the American Federation of Labor; the latter is not affiliated with any other organization, and its membership is confined to employees of petitioner's Pittsburgh plant. By May, each organization claimed to have been chosen by a majority of petitioner's employees to act as sole bargaining agent. On May 21, Kracik, international representative of the Amalgamated, met with Riley, a director of petitioner in charge of manufacturing, and gave him a copy of a contract proposed by the Union; and Riley agreed to discuss it with representatives of the Union. On the morning of the 24th, representatives of the Association asked Riley for an appointment to negotiate a contract, and he met both groups on that day.

The meeting with the Union representatives was held first. Riley demanded proof of the Union's authority, but they were unwilling then to reveal the Union's membership. Though the advisability of holding an election had been discussed, no method of proving the Union's authority had been agreed upon when Riley acceded to a request that the Union be given twenty-four hours in which to prove the extent of its membership.

When Riley met representatives of the Association, he likewise demanded proof of its authority, and the representatives offered to exhibit petitions· signed by a majority of the employees; but Riley declined to examine·them, stating that he did not wish to know which employees had joined either group. He informed the Association's representatives that the Union also claimed to represent a majority of the employees, and suggested to them also the advisability of a secret election. However, no decision was reached as to how the conflicting claims should be resolved.

That night the Union voted to strike, effective immediately. During the following four days the Mayor of Pittsburgh tried in vain to obtain the consent of petitioner and the two organizations to an election. The Union would not consent to an election if the Association's name· was to be on the ballot, because it claimed that petitioner had interfered with and dominated

the formation and administration of the Association.

The Association was then requested to present its petitions for examination and, on the morning of May 29, petitioner publicly announced that they had been signed by 1,383 of its 2,000 employees, and that it would bargain collectively with the Association. Negotiations during the next three days resulted in an agreement with it covering wages, hours and working conditions, the terms of which were incorporated in a bulletin mailed to each of petitioner's employees on June 1. The strike, however, prevented the operation of the plant.

On June 4, all parties agreed, in writing, to an election to be conducted by the director of the National Labor Relations Board for the Sixth Region. The names of both organizations were to be on the ballot, and petitioner agreed to recognize and commence negotiations with whichever received a majority of the votes cast, within ten days after results of the election were announced. A stipulation was entered into, however, that the holding of the election would not prejudice the rights of any parties who had filed "affidavits" before the Board, the purpose being to allow the Union to prosecute charges, already filed with the Board, that the Association was a company-dominated union.

The election was held on June 8, and the Union received 1,079 of the 1,882 votes cast. The plant reopened, and petitioner entered into negotiations with the Union.

Six or seven meetings were held between June 17 and 28, petitioner being represented generally by Donald W. Ebbert, an attorney, and by Riley and Shinabarger, both directors, and the latter an assistant to one of the vice-presidents. The subject of discussion at these meetings was a proposed contract relating to wages, hours and working conditions, that had been submitted by the Union. The introductory paragraph was as follows:

"This agreement, dated the......day of ......, 1937, between the H. J. Heinz Company (hereinafter referred to as the 'Employer'), and the Canning & Pickle Workers Local Union No. 325 of the Amalgamated Meat Cutters and Butcher Workmen of North America, or its successor (hereinafter referred to as the 'Union') * * *."

The only objection to this paragraph expressed by petitioner's representatives was to the phrase "or its successor," which the Union agreed to eliminate. The parties could not agree, however, upon the proposed closed-shop and pay-increase provisions.

On June 26, Wilner, the Union's attorney, requested that a higher official attend the next meeting, because Riley and Shinabarger had stated that their actions required approval of the other directors. Anderson, a vice-president, attended the meeting on June 28, but said little, though the meeting lasted an hour and a half. When Wilner asked him for a statement, he replied that, according to the reports he had received, nothing new had been discussed; and added that the directors had full confidence in Riley and Shinabarger; and there was evidence that he stated that they had full authority to act for petitioner, though this was denied by petitioner's witnesses.

Feeling that an impasse had been reached, the Union solicited the aid of federal and state intermediaries. At another meeting on July 1, petitioner refused to offer more than the ten per cent increase previously proposed, and the Union representatives departed saying they would submit petitioner's proposals to the Union that night. Shortly after the meeting adjourned, however, Riley sent for Kracik and told him that petitioner would not enter into a signed agreement with the Union. That night the Union accepted petitioner's counter proposals, which as previously agreed, were to go into effect as of July 1.

At a meeting on July 2, Wilner voiced objection to petitioner's refusal to enter into a signed agreement. Riley stated that it was petitioner's policy not to enter into such agreements with unions, and that it did not believe that the Act required it to do so. It was finally decided, however, that Wilner and Ebbert should prepare a memorandum embodying the terms agreed upon. On July 14, Riley, Shinabarger and Ebbert met with Union representatives to discuss the memorandum, which, according to Wilner and Ebbert, correctly expressed all the terms on which an agreement had been reached. Certain further changes were agreed upon, however, and Ebbert undertook to embody them in a final draft to be posted on petitioner's bulletin boards the following day. On the following day, pursuant to agreement, Ebbert sent Wilner a copy of the corrected memorandum, dated July 15. It was entitled "Notice to All

Employees," and the first paragraph read as follows: "Following the recent election held under the supervision of the National Labor Relations Board, in which the Canning and Pickle Workers' Local Union No. 325 was selected as the collective bargaining agency for our employees, we have had meetings with a committee from that organization and after several weeks of negotiation, have agreed with them as follows:" The memorandum concluded as follows:

"The wages rates and other matters hereinabove set forth shall remain in effect until further notice." And the typewritten signature of petitioner appeared at the end.

Upon being notified that the memorandum had not been posted as agreed, Wilner telephoned Ebbert and was informed that Anderson had objected to certain phrases in the memorandum and thought it should be submitted to Howard Heinz, president of petitioner, then absent, before it was posted.

On July 23 or 24, Ebbert informed Wilner that Heinz wished to rewrite the memorandum and no further action could then be taken.

On July 29 or 30, Ebbert submitted to Wilner a bulletin prepared by Heinz that differed materially from the July 14 memorandum. The introductory paragraph read: "According to the provisions of the National Labor Relations Act, we have bargained with the certified collective bargaining agency for our employees (not including, however, foremen, assistant foremen, who are paid on a monthly basis, policemen, outside truck drivers, office employees, or factory employees paid on the monthly basis) and the following understanding has been reached:"

The bulletin did not mention the name of the Union, and petitioner's signature did not appear at the end. It contained a rewording of the July 14 memorandum and embodied changes in substantive provisions. On July 31, Wilner protested to Ebbert against petitioner's procedure but added that he would present the bulletin to the Union.

At the August 11 meeting, representatives of the Union objected to the bulletin on several grounds, but particularly because the Union's name was omitted and the details of the grievance procedure eliminated. Petitioner's representatives replied that Heinz had made these changes to shorten the bulletin but consented to insert the Union's name in the paragraph relating to grievances and agreed to a change relating to payment for overtime. The Union representatives agreed that the bulletin thus modified should be posted. It was posted on August 15, but on August 17, Tasker, business agent of the Union, wrote the following letter to Riley:

"This is to advise you that the notice you have posted on your bill-board does not in our opinion constitute an agreement within the intent of the memorandum of understanding entered into by and between our Union and you on June 4, 1937, nor is it evidence of bona-fide collective bargaining within the meaning of that understanding or the National Labor Relations Act.

"Nevertheless, we realize that the concessions gained for the employees of the H. J. Heinz Company were the direct results of our efforts and we are anxious to conserve for the Heinz employees the benefits which they so richly deserve and for which we strove so hard.

"We, therefore, do not object to you (sic) posting of the notice but intend to lay this matter before the National Labor Relations Board in order to have that impartial agency determine whether or not you have bargained in good faith and whether you have done what our memorandum of understanding of the 4th of June, 1937, and the law requires of you."

The foregoing facts, for the most part, are not controverted. Neither is it disputed that the Union has been properly selected as the bargaining agent of petitioner's employees; nor denied that petitioner's business is of such nature as to subject it to the National Labor Relations Act.

■ Petitioner contends, however, that the Board's findings that it violated §§ 7, 8 (1) and 8 (2) of the Act are not supported by substantial evidence. But petitioner did at one time recognize and negotiate an agreement with the Association, a signed copy of which was sent to each employee, accompanied by a communication in which, after stating that the plant could not be immediately reopened because of the strike, petitioner said: "We believe that the support of the members of the Heinz Employee's Association will be an important factor in securing free access to our property." And there is substantial evidence that Heinrich, general plant superintendent, discouraged several employees from joining the Union, pointing out the benefits they had previously enjoyed and

asserting that they would not fare so well if the union became established in the plant. There was also testimony that foremen Locke, Vajentic, Hayes and Brooks, and foreladies Schirer and Fisher, had engaged in similar conduct antagonistic to the Union. There was also substantial evidence that signatures upon Association petitions were solicited by group leaders, time keepers, and ordinary employees, during working hours; that supervisory employees directed some of this solicitation; and that, on two occasions, foremen held departmental meetings for organization purposes. The Board found that petitioner, through its supervisory employees, had interfered with, restrained and coerced employees in the exercise of rights guaranteed to them by § 7 and had interfered with and dominated the organization and administration of the Association. Petitioner's chief criticism is that the Board did not believe its witnesses. Since, however, the Board's finding is based on substantial evidence, it must be accepted here. 29 U.S.C.A. § 160 (c); Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126. See National Labor Relations Board v. Waterman Steamship Corp. (decided February 12, 1940), 60 S.Ct. 493, 84 L.Ed. —.

Petitioner also contends that, even if its supervisory employees did engage in the aforesaid activities, there is no evidence that it expressly authorized or ratified those acts; on the contrary, when they were brought to its attention, it claims that all foremen were instructed to remain neutral and not discriminate against any employee because of union activities. But there was no evidence that petitioner directed any supervisory employee to communicate its alleged neutrality to the employees. If petitioner had really wanted its employees to know that they might with safety join whichever union they desired, the bulletin boards were the obvious and, because direct, the most effective means of assuring them of its impartiality. There was abundant evidence that the ordinary employees feared the disfavor of those from whom they were accustomed to taking orders. Since they were justified in believing that these supervisory employees were acting as petitioner's representatives, petitioner is responsible for what they did. National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951; Swift & Co. v. National Labor Relations Board, 10 Cir., 106 F.2d 87. Cf. National Labor Relations Board v. Swank Products, Inc., 3 Cir., 108 F.2d 872; Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 106 F.2d 100.

We are of the opinion that petitioner violated §§ 7, 8 (1) and 8 (2) of the Act, though there may have been neither express authorization nor ratification.

Petitioner contends that the Board's order that it withdraw recognition from and disestablish the Association is not warranted by the finding that it dominated and interfered with the organization and administration of the Association because it contends that the pro-Association activities were limited to the organization period and ceased some five months before the Board's complaint was filed; that not more than nine of its supervisory employees were shown ever to have participated; and that the election results revealed the ineffectiveness of their activities.

We are of the opinion that the Board's order should be enforced.

Section 10 (c) of the Act empowers the Board to order such affirmative action as will effectuate the policies of the Act. The record supports the Board's view that disestablishment of the Association is necessary to assure petitioner's employees that they are free to exercise the rights guaranteed to them by § 7. We doubt if any employee would infer from mere negotiation with the Union, pursuant to preelection promise and the mandate of the Act, that petitioner's favor had been withdrawn from the Association. As long as employees may reasonably entertain a belief that petitioner's favor can be won by abandoning the Union for the Association, they will not be free to exercise the rights guaranteed to them by § 7. If the Board has reasonable ground to believe that such a situation exists, it may direct the employer to employ whatever means it regards as reasonable to bring home to the employees that, as far as their employer is concerned, they are entirely free to exercise all the rights guaranteed in § 7. The fact that even here petitioner seeks to justify its refusal to enter into a written contract, in part, upon the ground that a large proportion of its employees voted for the Association, indicates that it still accords the Association recognition in violation of the Act and shows that the Board did not abuse its discretion in directing the disestablishment of the Association. See National Labor Relations Board v.

Falk Corporation (decided January 2, 1940), 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. ——; National Labor Relations Board v. Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co'. (decided December 4, 1939), 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed.——; National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. Cf. National Licorice Co. v. National Labor Relations Board (decided March 4, 1940), 60 S.Ct. 569, 84 L.Ed. ——; Federal Communications Commission v. Pottsville Broadcasting Co. (decided January 29, 1940), 60 S.Ct. 437, 84 L.Ed. ——.

■ Petitioner also attacks the Board's conclusion that it had engaged in unfair labor practices within the meaning of § 8 (5), by not bargaining in good faith with the Union, as shown by: (1) refusal to enter into a signed agreement with the Union embodying terms agreed upon; (2) withholding from the Union the essential status of an equal during the negotiations; (3) repudiation and change of the terms of the July 14 bulletin after they had been approved as final by persons represented to have authority to act for petitioner; (4) adoption of dilatory tactics, manifested particularly by Anderson's refusal to post the July 14 memorandum, by rewriting it and refusing to incorporate in the August 15 bulletin the agreed procedure for settling grievances, to the terms of which it had no objection.

We are of the opinion that there was substantial evidence to support the findings upon which the Board based its conclusion that petitioner had violated § 8 (5). And we think this is so irrespective of petitioner's refusal to enter into a written agreement.

■ Does § 8 (5) require the employer to embody terms agreed upon with a Union in a written contract?

The Seventh Circuit recently considered this problem in Inland Steel Company v. National Labor Relations Board (decided January 9, 1940), 7 Cir., 109 F.2d 9, and concluded that no written agreement is required by the Act under any circumstances. It construed the language of the Act literally and rejected the historical argument that Congress must have intended that any understanding arrived at be embodied in a written agreement because such had long been the general prac-

tice and because Congress must have been familiar with the old Labor Board's practice of requiring written contracts under such circumstances.

The opposite conclusion was reached by the Second Circuit, in the case of Art Metals Construction Co. v. National Labor Relations Board (decided February 26, 1940), 2 Cir., 110 F.2d 148. Judge Learned Hand, writing for the Court, said: "The argument on this point rests upon the admitted truth that the act does not force the parties to come to any agreement at all; for, although an employer must honestly negotiate with his employees collectively, that is as far as he need go. But if, the argument runs, he is forced to make it a term of any oral agreement that it shall be put into writing, he loses that absolute freedom in negotiation which he had at common law, and which Congress meant to preserve to him. Inland Steel Company v. N. L. R. B., 7 Cir., 109 F.2d 9. It is indeed true, and for that matter a truism, that a stipulation in an oral contract that it shall be put into writing is one of its terms, and that if an employer must put it in, he is not free pro tanto. But he is no longer wholly free anyway; before the act he was not obliged to bargain with his employees collectively; he was at liberty to refuse to negotiate with them at all, or otherwise than severally. The act impaired that freedom; it meant to give to the employees whatever advantage they would get from collective pressure upon their employer; and the question here is what are the fair implications of that grant. They should include whatever is reasonably appropriate to protect it, and no one can dispute that a permanent memorial of any negotiation which results in a bargain, is not only appropriate, but practically necessary, to its preservation; it is hardly necessary to observe that without it the fruits of the privilege are exposed to the sport of fugitive and biased recollection. The purpose of a contract is to define the promised performance, so that when it becomes due, the parties may know the extent to which the promisor is bound; and it is the merest casuistry to argue that the promisor's freedom to contract includes the opportunity to put in jeopardy the ascertainment of what he has agreed to do, or indeed whether he has agreed to anything at all. The freedom reserved to the employer is freedom to refuse concessions in working conditions to his employees, and to exact concessions from them; it is not the freedom, once

they have in fact agreed upon those conditions, to compromise the value of the whole proceeding, and probably make it nugatory."

The Fourth Circuit followed Judge Hand's reasoning in National Labor Relations Board v. Highland Park Manufacturing Co. (decided March 11, 1940), 4 Cir., 110 F.2d 632.

We are in accord with the reasoning and the conclusions reached by the Second and Fourth Circuits and, therefore, approve the Board's conclusion that respondent violated § 8 (5) by not embodying the understandings reached in a signed agreement.

However, if the view of the Seventh Circuit be accepted, it does not follow that the Board's order is invalid. We are of the opinion that the order is more obviously justified by § 10 (c), which requires the Board, when it has found an employer guilty of an unfair labor practice, to serve an order "requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action, * * * as will effectuate the policies of this chapter."

■ The Act nowhere in terms confers upon the Board the power to require an employer to post any notice, yet its power in this respect is now well established. See National Labor Relations Board v. Greyhound Lines, supra. In National Labor Relations Board v. Falk Corporation (decided on January 2, 1940), 308 U.S. 453, 60 S.Ct. 307, 312, 84 L.Ed.——, an order to post notices promising to cease and desist was upheld.

Discussing the Board's power to require the posting of such notices, Mr. Justice Black said: "The court also modified the Board's order by omitting the requirement that the notices to be posted in the plant contain a statement that the company would 'cease and desist' from its unlawful activities. As stated in the first opinion of the court below, the purpose of the Board in requiring the company to publish notices assuring its employees that it would 'cease and desist' had been 'to convey to the employees the knowledge of a guarantee of an unhampered right in the future to determine their own labor affiliation.' Knowledge on the part of the men that the company would cease and desist from hampering, interfering with and coercing them in selection of a bargaining agent, which the Board found the company had

done successfully in the past, was essential if the employees were to feel free to exercise their rights without incurring the company's disfavor. But the notices as permitted by the court's modifying order not only failed to assure the men that the company would cease its unlawful and coercive practices, but—backed with the prestige of a formal court order—told the men that Independent, while in terms disestablished for the time being, was still available for selection by the employees. Thus the modified notices neither renounced the company's unlawful practices nor promised their abandonment, and left as a candidate the Independent, toward which the unrenounced unlawful activities of the company had been directed. We think the plant notices as modified by the court's order fell far short of conveying 'to the employees the knowledge of a guarantee of an unhampered right in the future to determine their labor affiliations.'"

The employees' need of assurance probably always justifies an order to the employer to post notices that he will bargain collectively with a particular union, etc., and the Falk case makes it clear that under some circumstances he may be required to post a notice that he will cease and desist from unfair labor practices found by the Board, though it may be doubted whether the Court meant to lay down the rule that the posting of such a notice can be required in every case. The Board might abuse its discretion in this respect, but the Supreme Court saw no abuse in the Falk case.

■ Petitioner's refusal to execute a written agreement at the request of the Union may well have left the employees suspicious of its good faith and with a sense of insecurity that does not ordinarily exist when neither party has reasonable ground to doubt the other's good faith. We are of the opinion that the sense of insecurity engendered by petitioner's strange unwillingness to execute a written contract embodying terms that it would have its employees believe it had orally agreed to in good faith, required the Board to exercise the power conferred in § 10 (c). There was no abuse of discretion in the order as made. National Labor Relations Board v. Highland Park Mfg. Co., supra.

In view of the conclusion we have reached as to this matter, we deem it unnecessary to consider the other grounds enumerated above, upon which the Board based

its conclusion that petitioner had violated § 8 (5).

Petitioner denies the Board's power to require it to post notices in the form ordered. We are of the opinion that the Board did not abuse its discretion in this respect. See National Labor Relations Board v. Falk Corp., supra. Cf. National Licorice Co. v. National Labor Relations Board, supra.

The order of the Board will be enforced.