## CONTINENTAL OIL CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 1902.

Circuit Court of Appeals, Tenth Circuit.

June 13, 1940.

Rehearing Denied July 31, 1940.

John P. Akolt, of Denver, Colo. (James J. Cosgrove, of Ponca City, Okl., and John R. Moran and Smith, Brock, Akolt & Campbell, all of Denver, Colo., on the brief), for petitioner.

Ernest A. Gross, of Washington, D. C. (Charles Fahy, General Counsel, Robert B. Watts, Associate General Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Bertram Edises and Morris P. Glushien, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before BRATTON, Circuit Judge, and VAUGHT and MURRAH, District Judges.

BRATTON, Circuit Judge.

This proceeding is before the court on petition to set aside and answer seeking enforcement of an order of the National Labor Relations Board. Petitioner, a corporation organized under the laws of Delaware, with its principal offices at Ponca City, Oklahoma, was engaged in the production of crude oil in the Salt Creek Oil Field, the production of crude oil in the Big Muddy Oil Field, and the operation of a crude oil refinery at Glenrock, all in the State of Wyoming. In September, 1937, Oil Workers International Union, hereinafter called the union, filed with the Board a petition requesting an investigation and certification of representatives for purposes of collective bargaining in the Salt Creek Field. Thereafter, upon charges and amended charges lodged by the union, the Board issued its amended complaint in which petitioner was charged with unfair labor practices in each oil field and at the refinery. Following conventional procedure, had in a consolidated hearing, the Board ordered petitioner to cease and desist from refusing to bargain collectively with the union as the exclusive representative of its employees in the Big Muddy Field; from refusing to bargain in like manner at the refinery; from dominating or interfering with the administration of Independent Association of Conoco Glenrock Refinery Employees, or with the formation or administration of any other labor organization of its employees; from contributing support to such Association or any other organization of its employees; from discouraging membership in the union or any other labor organization by transferring, discharging, or refusing to re-employ any of its employees, or in any other manner discriminating in respect to their employment; and from restraining, coercing, or otherwise interfering with its employees in their right of self-organization for collective bargaining. The order further required petitioner upon request to bargain collectively with the union as the exclusive representative of its employees at the Big Muddy Field, and at the Glenrock refinery, and in the event the union should be thereafter certified by the Board as the exclusive representative of the employees in the Salt Creek Field, then upon request similarly to bargain with it there; to withdraw recognition from and completely disestablish Independent Association of Conoco Glenrock Refinery Employees; to withdraw recognition from Continental Employees Bargaining Association; to offer Ernest Jones and F. D. Moore immediate and full reinstatement to the respective positions formerly held by them at the Big Muddy Field, or positions substantially equivalent thereto, and to make them whole by payment to each of a sum equal to that which he would normally have earned as wages during the period intermediate the termination of his employment and the offer of reinstatement, less his net earnings during such period; to procure for Moore the restoration of the insurance rights which were lost upon the termination of his employment; and to post appropriate notices that it would desist and comply with such provisions. In addition, the order directed that an election be held at the Salt Creek Field within twenty days for the purpose of determining whether the employees desired to be

represented by the union. The election was held, and the Board certified that a majority had selected the union for that purpose.

■ *The jurisdiction of the Board.*— Petitioner produces, refines, transports, and markets petroleum and petroleum products on a large scale. It owns or controls oil and gas properties and refining plants in 13 states, and it owns or controls outlets for the distribution and marketing of its products in 31 states. In 1937 it produced about 1000 barrels of crude oil daily at the Salt Creek Field, of which about 650 barrels were for its own account and were sold under contract to the Stanolind Oil and Gas Company in the field. Approximately 3000 gallons of casinghead gasoline were produced daily at such field, all of which was shipped to the refinery of petitioner at Lewistown, Montana. About 1200 barrels of crude oil were produced daily in the Big Muddy Field, of which about 900 barrels were for the account of petitioner, the remainder being "due to joint ownership of the leases from which the oil is produced, and royalties." All of such oil was shipped by pipe line to the refinery at Glenrock where it was refined. About 2500 barrels were refined daily at the refinery in Glenrock, some from the Big Muddy Field and some from operations of petitioner in the Lance Creek Field in Wyoming. Some 8000 gallons of casinghead gasoline were received daily at the refinery in Glenrock from the operations of petitioner in the Lance Creek Field, being transported by truck, pipe line and rail. About sixty per cent of the products produced at the Glenrock refinery were shipped by rail in tank cars owned or leased by petitioner to points outside the State of Wyoming, for sale to consumers living in other states. Approximately fifty per cent of the total production of fuel oil produced at the refinery was sold to two railroad companies engaged in interstate commerce, the amount thus sold being about 25,000 barrels. And the annual value of the finished products shipped from the refinery was approximately $2,000,000.

The scope of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., and the jurisdiction of the Board in its administration, are confined to interstate and foreign commerce, to the exclusion of operations which are essentially intrastate in character and which have no effect upon interstate commerce. But the statute leaves to be determined in each case whether the particular action affects interstate commerce in such a close and intimate fashion as to be subject to federal control. And it is enough to bring an employer within the scope of the act and to confer jurisdiction on the Board if the consequences which arise or reasonably may arise from the acts and practices complained of necessarily result or are reasonably calculated to result in a stoppage or serious impediment to the free flow of interstate commerce. National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014. The nature and extent of the operations of petitioner clearly bring its activities into such close and substantial relation to interstate commerce as to subject it to the jurisdiction of the Board. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Fruehauf Trailer Co., 301 U.S. 49, 57 S.Ct. 642, 630, 81 L.Ed. 918, 108 A.L.R. 1352; Santa Cruz Fruit Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Fainblatt, supra; Southern Colorado Power Co. v. National Labor Relations Board, 10 Cir., 111 F.2d 539.

■ *The identity of the union.*—The parts of the order requiring petitioner to bargain collectively with the union at the Big Muddy Field and at the Glenrock refinery are challenged on the ground that the union never sought to bargain collectively with petitioner and therefore there could not have been refusal to bargain within the meaning of the act. The argument is that the efforts to bargain on which the order rests were made by International Association of Oil Field, Gas Well and Refinery Workers of America, not the union. Initially the union bore the name of International Association of Oil Field, Gas Well and Refinery Workers of America. It assumed its present name at a convention held in Kansas City in June, 1937. There was no change in officers or central offices; the change was only in name; and continuity of organization was preserved. The designations, correspondence, contracts submitted, and other efforts to bargain collectively on which the order

rests, were made, had, submitted, and exerted before the change in name and were therefore in the original name of the union. But the charges were lodged with the Board after the change and were therefore in the new name, and in the order the Board referred to the union in like manner. While it may be said that the change in name included a shift in affiliation from the American Federation of Labor to the Committee for Industrial Organization, there was no such disruption or change of identity as to affect in any manner the validity of the parts of the order requiring petitioner to bargain collectively with the union.

*The Salt Creek Field.*—By supplemental petition it is alleged that this field practically in its entirety has been subjected to a unit plan of operation by agreement among the various operators therein, including petitioner; that the agreement was executed, and approved by the Secretary of the Interior, pursuant to the Act of February 25, 1920, 41 Stat. 437, as amended by the Act of August 21, 1935, 49 Stat. 674, 30 U.S.C.A. § 181 et seq.; that such agreement was dated January 10, was approved by the Secretary on August 26, and became effective on September 1, 1939; that under such plan Midwest Oil Company and Mountain Producers Corporation were jointly designated as the operator of the lands covered by the agreement; that such companies entered into a contract with Stanolind Oil & Gas Company pursuant to which that company has undertaken to carry out the operations in the unit area; that all but one small tract of the lands theretofore operated by petitioner are covered by and have been subjected to the unit agreement; that as to the one small tract petitioner on September 1, 1939, entered into a separate contract with Stanolind Company whereby that company has taken over all the operations to be conducted thereon; that because of such developments, petitioner, as of the end of August, 1939, terminated the employment of all its employees in the field, except four who were transferred to other fields in which it operates; that since August 31, 1939, it has not had any employees in the field, is not conducting any business there, and will not conduct any business there in the future as both of the contracts mentioned are permanent in nature as to time.

The Board neither expressly admits nor denies the facts alleged in the supplemental petition but in effect admits them. It is implicit in the brief of the Board that the facts set up are true. The contentions of the Board are that the order runs not only against petitioner, but also against its successors and assigns; that events which occur subsequent to the order are not material; that an order must be enforced on the basis of the record, not upon the record plus subsequently occurring facts; and that petitioner does not contend that the order has been obeyed.

Ordinarily the question of enforcement of an order of this kind must be determined on the record made before the Board, not factual developments which occur after the order was entered. And, of course, subsequent steps taken for the purpose of evading obedience to an order will not be accorded any consideration. But here the entire field has been subjected to a unit plan of operation. All of the companies operating there, including petitioner, joined in the plan, and it was approved by the Secretary of the Interior pursuant to an act of Congress. Under its terms two companies were designated as the joint operator, and they in turn made a contract with a third company pursuant to which it is now conducting the operations in the field. All of the lands operated by petitioner, except one small tract, were included in the plan, and pursuant to a separate contract the operating company is also operating that tract. Petitioner has no employees in the field. There is no appropriate unit with whom it can bargain. There are no questions relating to wages, hours, or working conditions for consideration or determination. No agreement could possibly be reached or performed. It is trite to say that courts do not decide questions which have become moot. This court will not lend itself to the empty and futile gesture of commanding enforcement of an order of the Board directing petitioner to bargain collectively with a unit which is now nonexistent, in respect to questions which are now nonexistent, arising out of operations which are now nonexistent.

*The Big Muddy Field.*—The Board found that in August, 1935, and thereafter, petitioner refused to bargain collectively with the union as the exclusive bargaining agency at this field. As subsidiary findings, the Board further found that resulting from an election held in July, 1934, the Petroleum Labor Policy Board certified the union as the collective bargain-

ing agency; that soon thereafter a committee representing the union presented a proposed agreement to J. C. Thomas, superintendent of production for the Wyoming District; that in response to such proposed agreement, petitioner, on September 18, 1934, issued a statement of working conditions for the field which contained the statement among others that no understanding between petitioner and any association of employees should be considered as binding upon employees not members of such association; that at the time of the issuance of such statement, R. S. Shannon, general superintendent of production for the Rocky Mountain Division, announced that petitioner was ready to meet with any committee but would not recognize the union as the exclusive bargaining agency for its employees; that petitioner addressed letters to its employees in which it was stated that those who wished to be represented by the union might do so, but that others who might choose any other representative were entitled so to deal with the management, and that the management was prepared to deal with any such organization as the employees might choose to undertake, without management interference; that by letter written in March, 1935, the union took exception to the refusal of petitioner to recognize it as the representative of the employees and to enter into a contract with the union; that as the result of such communication a meeting was held between the committee and representatives of petitioner at which Shannon reiterated the position of petitioner as set forth in the statement of working conditions issued in September; that shortly after the passage of the National Labor Relations Board Act in July, 1935, a majority of the employees signed a petition designating the union as the collective bargaining agency; that on August 12, 1935, the date of the first attempt at collective bargaining after passage of the act, and thereafter, the union was the duly designated representative of a majority of the employees for such purpose; that on August 12, a letter was delivered to Bartels, production foreman at the field, informing petitioner that the union had been selected as the bargaining agency and requesting a conference for collective bargaining; that no answer having been received, a letter dated September 5 was delivered to Shannon requesting a conference; that pursuant to the second letter a meeting was held about September 26; that at such meeting the representatives of the union stated to Shannon that they represented the union, that the union had been selected as the bargaining agency, that they had in their possession a petition signed by a majority of the employees, and asked if he desired to see it; that Shannon replied that he considered the petition immaterial, and that he raised no question as to whether the union had been designated by a majority of the employees; that in response to a request that the union be recognized as the exclusive bargaining agency Shannon stated that petitioner maintained the same position as that set forth in the statement of policy of September 18, 1934, that it would not recognize any group as the exclusive bargaining agency but was willing to meet with any committee of individual employees, and that petitioner would not enter into any agreement with the union, not even to embody the provisions which petitioner had set forth in its own statement of September 18; that after a further exchange of letters had proved fruitless, a meeting was held on February 6, 1936, at which a conciliator for the Department of Labor was present; that at such conference a proposed contract presented by the union was discussed and the parties came to an agreement in respect to working conditions, which were embodied in notes taken by the conciliator; that Thomas stated he could not bind petitioner to such conditions but would submit them together with his recommendations to Shannon for approval; that the union did not receive any further communication from petitioner respecting such proposed agreement; that apparently as the result of the letter written by a representative of the Board, Shannon in May, 1936, approached a representative of the union for a meeting to discuss the tentative agreement which had been negotiated at the conference held February 6; that the representative of the union asked Shannon whether he was in a position to bind petitioner, to which he replied that the discussion was to be purely informal; that the representative of the union then inquired whether Shannon would enter into joint recommendations to be referred to the central office of petitioner for adoption, to which Shannon replied in the negative; and that the representative of the union then stated that he saw no purpose in continuing the discussions unless there was some possibility of reaching an agreement, and that unless the union could meet with the management with a view of enter-

ing into a definite agreement, it would not ask for further meetings but would submit the matter to the Board.

Petitioner asserts that the petition circulated and signed in July, 1935, after passage of the act, was a statement that the employees who signed it had organized the union; that only ten of the twenty-eight employees who signed it were actually members of the union; that it was not a designation by nonmembers of the union as a representative for bargaining purposes; that it was not a designation of an exclusive bargaining agency within the contemplation of the act but only purported to speak for the members signing it and not for all members in the unit; that its substantial effect was a petition for an election to select an exclusive bargaining agency; and that it was never exhibited to petitioner prior to the hearing in this proceeding. The instrument recites at the outset that the signing employees had organized themselves into Local 242 of the union, in pursuance of the right of self-organization guaranteed in the act; that recitation is followed immediately by the statement that through such organization and the duly designated and authorized representatives and officers, the signers desire to make a collective bargain with their employer, as authorized by law, and that they do not wish to make individual bargains; then follows the statement that the signing employees therefore respectfully request a conference with representatives of the management at their earliest convenience to begin negotiations to work out a collective bargain and to agree on terms of employment and orderly methods of settling differences in the relation between the management and the employees; and then the concluding statement is that in the event petitioner questions the right of representatives of the union to speak for the undersigned employees, they petition the Board to conduct an election for the purpose of determining the choice of the employees of representatives for the purpose of collective bargaining. The instrument indicates clearly a purpose to designate the union as the representative of the employees for the purpose of collective bargaining. That is its rationale. It will not reasonably bear any other interpretation. And the fact that some of the persons signing it were not members of the union makes no difference. Section 9(a) of the act provides that representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes shall be the exclusive representatives of all of the employees in such unit for such purposes. It does not require that all members of the majority making the selection shall be members of the agency selected. Such a limitation is not to be found either in the language or fair intendment of the statute. Neither does the fact that the designation was not exhibited to petitioner prior to the hearing have decisive bearing. Representatives of the union stated to Shannon in the course of the conference had in September, 1935, that they had such petition in their possession and asked whether he desired to see it, to which he replied that he regarded it as immaterial and that he raised no question as to the union having been designated by a majority of the employees as the exclusive bargaining agency. For all material purposes that was the equivalent of exhibiting the petition or delivering it to Shannon.

■ Stress is laid upon the point that even though the instrument signed in July, 1935, be treated as a designation of the union, still sixteen out of the twenty-one employees in the field subsequently formed themselves into an independent labor organization, as provided in the act, and that thereafter the union was no longer the exclusive bargaining agency. It is unnecessary to determine at this point whether the independent union was organized in the manner authorized in the act. It is enough to say that it was not organized until June, 1937. It therefore could not affect the status of the union from August, 1935, to May, 1936. And if during that time petitioner wrongfully refused to bargain with the union, as the Board found, it could not be relieved of the consequences by the subsequent formation of the independent union. National Licorice Co. v. National Labor Relations Board, 60 S.Ct. 569, 84 L. Ed. 799.

■ While the act contemplates the making of contracts with labor organizations, it does not require parties to agree. But it does require an employer to negotiate in good faith with the purpose of coming to an agreement if possible. Consolidated Edison Co. v. National Labor Relations Board, supra. Where an oral agreement is reached it is the duty of the parties to embody it in a written contract as a mutual guaranty of conduct. And refusal of an employer to join in a contract

embodying an oral agreement reached with its employees amounts to a failure to comply with the act. Globe Cotton Mills v. National Labor Relations Board, 5 Cir., 103 F.2d 91; Art Metals Construction Co. v. National Labor Relations Board, 2 Cir., 110 F.2d 148; National Labor Relations Board v. Highland Park Manufacturing Co., 4 Cir., 110 F.2d 632; H. J. Heinz Co. v. National Labor Relations Board, 6 Cir., 110 F.2d 843. Petitioner's reaffirmation after passage of the act of the policies stated in the letter of September 18, 1934, and its refusal to embody such policies in a written contract constituted a failure to comply with the act.

 It is urged with emphasis that even assuming that in August, 1935, and soon thereafter, petitioner engaged in an unfair labor practice by refusing to recognize the union as the exclusive bargaining agency, still the evidence shows that at the time of the hearing and prior thereto membership in the union had shrunk to only four, and that it therefore was beyond the power of the Board to compel petitioner to conduct bargaining activities with it. It is a reasonable assumption that any diminution in membership of the union was due in large measure to the wrongful failure and refusal of petitioner to bargain with it as representative of the employees in the manner required by the act; and an employer cannot discredit a duly designated bargaining agency of its employees by refusing to bargain with it and then be allowed to take advantage of a loss in membership due to its wrongful act. Where reduction in membership has been occasioned by such action on the part of the employer, an order requiring the employer to bargain as contemplated by the act is reasonably necessary and proper to overcome the effect of the interference with self-organization. National Labor Relations Board v. Highland Park Manufacturing Co., supra.

 Evidence was introduced concerning written and verbal statements made by petitioner prior to the passage of the act. Such statements could not within and of themselves constitute a refusal to bargain with the union within the meaning of section 8(5) of the act. But they threw light upon the attitude of petitioner in respect to recognizing the union as a bargaining agency, and the Board was warranted in taking them into consideration in determining whether after passage of the act petitioner negotiated in good faith with the view of reaching an agreement if possible, whether it negotiated but with a closed mind against reaching any agreement however reasonable and fair, and whether it conferred but with a fixed resolve throughout not to come to any accord. Especially is that true since in the course of negotiation and conference had after passage of the act, petitioner made specific reference to the letter of September 18, 1934, reiterated the position outlined in it, but announced that it would not enter into an agreement which merely embodied the provisions of such letter.

 The act provides that the findings of the Board shall be conclusive on appeal if supported by substantial evidence. Section 10(e) (f). As used in the statute, substantial evidence means more than a mere scintilla of evidence. It must do more than create vagueness, uncertainty or suspicion of the existence of the essential fact to be established. It must carry such conviction that a person of ordinary mind might reasonably accept it as adequate upon which to form a definite conclusion. Consolidated Edison Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660. But a court on review cannot substitute its judgment for that of the Board on disputed facts. A court is not free to overturn a finding of the Board which is supported by substantial evidence, even though the court might reach a different conclusion on the conflicting evidence. National Labor Relations Board v. Waterman Steamship Corporation, 60 S.Ct. 493, 84 L.Ed. 704; Swift & Co. v. National Labor Relations Board, 10 Cir., 106 F.2d 87; Southern Colorado Power Company v. National Labor Relations Board, supra.

 There were sharp conflicts in the evidence, but the credibility of the witnesses, the weight to be given to their testimony, and the determination of the conflicts were matters for the Board, not this court. National Labor Relations Board v. Waterman Steamship Corporation, supra; Swift & Co. v. National Labor Relations Board, supra; Southern Colorado Power Company v. National Labor Relations Board, supra. The finding that at the times stated petitioner refused to bargain collectively with the union as the exclusive bargaining agency of its em-

ployees is supported by substantial evidence and therefore cannot be overturned on review.

**The Glenrock Refinery.**—The refinery is located only about two and one-half miles from the Big Muddy Field, and some of the employees at the refinery also belong to Local 242 of the union. The Board found that in August, 1935, and thereafter, petitioner refused to bargain collectively with the union as the representative of its employees in an appropriate unit, with respect to rates of pay, wages, hours of employment, and other conditions of employment, and thereby interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in section 7 of the act; and that it dominated and interfered with the formation and administration of Glenrock Association and thereby interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed under such section. As subsidiary findings, the Board found that following an election held in July, 1934, the Petroleum Labor Policy Board certified the union as the collective bargaining agency of the employees at the refinery; that shortly after such certification a representative of the union called upon Carl R. Tillman, superintendent of the refinery, and expressed the desire of the union to meet with petitioner and negotiate a collective agreement; that in the course of the discussion the representative of the union objected to the action of petitioner in bargaining with Employees Council Plan, an organization sponsored and supported by petitioner, despite the certification of the union; that Tillman replied that petitioner preferred to meet directly with its employees and would continue to do so; that the proposal of the union for a contract covering working conditions was answered by a letter dated September 22, 1934, similar in context and form to the letter of September 18, 1934, relating to the Big Muddy Field; that in a meeting held in December, 1934, Walter Miller, vice-president in charge of refining, stated that petitioner was willing to meet with any committee of employees or with any individual employee, but would not recognize any group as the exclusive bargaining agency; that in April, 1935, petitioner announced an increase in wages and stated that it had been obtained through the efforts of Employees Council Plan; that shortly after passage of the act, the union circulated among the employees a petition designating the union as collective bargaining agent, that a majority of the employees in the appropriate unit signed such petition, and that on August 12, 1935, the date of its first attempt to bargain collectively after passage of the act, and thereafter, the union was the duly designated representative of a majority of the employees and was the exclusive representative of all of the employees in such unit for the purposes of bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment; that the passage of the act marked no change in the attitude of petitioner; that a letter was delivered to petitioner stating that the union had been designated as a bargaining agency, and requesting a conference for the purpose of collective bargaining; that in answering such letter, Miller stated he had answered right along that as a result of the conferences and meetings had in the past there was a full understanding in respect to the working conditions which petitioner had maintained, and methods of handling grievances with employees, that he thought petitioner's attitude regarding its relations with its employees was thoroughly understood, that he was at a loss to understand what the union had in mind in stating that it wished to make a collective bargain, as according to his way of thinking petitioner had been collectively bargaining with its employees, one group through the council and the other through Local 242; that after further correspondence, a meeting was held at which Tillman was present; that the union presented a proposed agreement, and Tillman stated that he could not bargain on the matters but would refer the agreement to Miller; that in a lengthy letter to the union dated January 31, 1936, Miller rejected all of the proposals, stated that most of them had been covered in his letter of September 22, 1934, and that the working conditions therein set forth were still being maintained, reaffirmed the working conditions and grievance procedure described in the former letter, and further stated that he was ready to come to Glenrock for a meeting and discussion at any time within reason if it appeared that some good could be accomplished, but that in view of the number of times the points in disagreement had been discussed, the attitude of petitioner was undoubtedly well known to all of them; that a later request for an increase

in wages was denied on March 14, 1936, in a letter of much the same tone; that such letter marked the end of negotiations; that throughout such negotiations, petitioner did not make any counter proposals; that at an election conducted by the Petroleum Labor Policy Board held in 1934, a minority of the employees registered their approval of an employee-representation plan; that with the assistance of Miller, a committee thereafter circularized the employees suggesting that such minority should proceed to organize such a plan and put it into effect, and with the assistance of petitioner Employees Council Plan was evolved; that the plan made no provision for membership meetings and left the conduct of its business to the employee representatives, all expenses were paid by petitioner, the chief clerk at the refinery was selected as secretary, he attended meetings and participated in discussions, and grievances were presented to petitioner through him; that after the validity of the act had been sustained, Miller wrote Tillman that the plan was no longer lawful and petitioner could no longer deal with it, he suggested that it be changed to conform to the law and expressed the opinion that it could be made legal by the cessation of financial support from petitioner and the exclusion of any agent of petitioner from meetings of employee representatives, he further suggested that the employee representatives could either revise the plan to conform to the act, or in the alternative, create a new organization to supplant the existing council plan, and he concluded by directing Tillman to tell the men if they decided to work up something to fit the new conditions and wanted to consult with him, he would be glad to come to Glenrock for that purpose in the near future; that Tillman apprised the employee representatives of the contents of such letter; that with the assistance of the chief clerk the employee representatives prepared a new plan which in effect was merely the old plan revised to meet certain of the objections raised by the act, but such plan failed of acceptance and was dropped; that about a month later a committee of employees prepared the constitution and by-laws of Independent Association of Conoco Glenrock Refinery Employees, and by petition circulated throughout the plant a majority of the employees approved them; that such constitution and by-laws were patterned in large part after the council plan; that with little change the association assumed the position of the council plan, the machinery for the presentation of grievances being identical except for the omission of the chief clerk as intermediary between the organization and petitioner; that communications from petitioner to the association were written on stationery headed "For Interdepartment Correspondence Only"; that petitioner regarded the association as a continuation of the council plan; that soon after its organization, the association requested petitioner to recognize it as bargaining representative for members of the organization; that Miller promptly recognized it, and at the same time requested its officers to assure him that it had been designated by a majority of the employees; and that the difference in attitude of petitioner toward the union and toward the association created the clear inference that it favored the latter.

Some of the contentions urged here are identical with those advanced in connection with the Big Muddy Field. No useful purpose would be served by discussing them anew.

The council plan was organized in August, 1934, and it continued to function until about April, 1937. It is argued that from the time the council plan was organized it represented a majority of the employees, not the union. But membership in the plan did not represent the free and unhampered action of the employees, and for that reason did not constitute a revocation of the status of the union as bargaining agency acquired by the election and certificate of the Petroleum Labor Policy Board. Furthermore, the petition signed by a majority of the employees in July, 1935, designating the union as bargaining agency was subsequent in point of time to the formation of the council plan, and constituted a fresh mandate from that time forward.

It is the further contention that the independent union was organized in May or June, 1937; that a majority of the employees joined in its organization; that it has existed ever since; and that at the time of the hearing and prior thereto it represented a majority of the employees with the result that the union did not. But the association was merely a continuation of the council plan; it was organized at the suggestion of the petitioner; it was not a free and unhampered action on the part of a majority of the employees; and it did not

effect a revocation of the bargaining agency of the union. Not only so, but the participation of petitioner in revamping or recasting the organization constituted interference and domination, within the meaning of section 8 (2) and (1). Swift & Company v. National Labor Relations Board, supra.

■ A painstaking review of the record convinces us that the subsidiary findings are supported by substantial evidence, and that from such findings the Board was warranted in drawing the inference that in August, 1935, and thereafter, the union was the duly designated bargaining agency for the employees; that petitioner wrongfully refused to bargain collectively with the union as bargaining agency with respect to rates of pay, wages, hours, and other conditions of employment; and that it dominated and interfered with the formation and administration of the association, and in that manner interfered with, restrained, and coerced its employees in the exercise of rights guaranteed by the act. In other words, the primary findings of fact challenged are supported by substantial evidence and must stand.

■ *Discriminatory transfers or discharges of employees.*—Petitioner determined that on May 1, 1936, it would change from a thirty-six hour to a forty-eight hour per week working schedule at the Big Muddy Field, and that the change would necessitate a reduction of four in the number of employees. The change in schedule would increase the monthly wages of employees, but would reduce the rate per hour. It was the policy of petitioner in effecting reductions in working force not to discharge employees but to take care of them by transfers to other fields if that could be done. F. D. Moore had been in the employ of petitioner since 1919, and was a roustabout. Ernest Jones had been employed since 1926, and was a relief pumper. Moore was second and Jones was fifth or sixth in seniority among some thirty employees. Both were members of the union, were officers of the union, and were on the committee which was engaged in bargaining negotiations with petitioner. Without previous notice or discussion, they were advised on April 27 and 28 respectively that they had been transferred to Hobbs, New Mexico, a distance of about 800 miles from the Big Muddy Field, and that they were to report there on May 1. Members of the committee called on Thomas and inquired as to the reasons for the transfers, and were then informed for the first time that the hours of work were to be increased with the curtailment in force. The committee requested a postponement of the transfers and the effective date of the increase in hours until they could be heard respecting the matter. Thomas stated that he would communicate with Shannon and attempt to arrange a meeting, but no meeting was held and the effective date of the change in working schedule was not changed. Upon verifying Moore's statement that his wife was ill, petitioner offered to transfer him to Fort Collins, Colorado, but he declined to accept. Later he was advised that he could retain his job at the Big Muddy Field for the duration of his wife's illness. He declined that offer, was given a "Termination Check", and at the request of petitioner relinquished the house he had been occupying as a residence and left the field. Jones also refused to accept the transfer to Hobbs, was told that there was no work for him, and was given a like check.

The act does not interfere with the exercise of the normal right of an employer to discharge or transfer employees in the course of business. National Labor Relations Board v. Jones & Laughlin Steel Corp., supra; Link-Belt Co. v. National Labor Relations Board, 7 Cir., 110 F.2d 506. But there is little room for doubt that the transfer of an employee, or the change in status of an employee from permanent to temporary, traceable to membership in a labor union or to activities on behalf of a bargaining agency, constitutes discrimination within the interdiction of section 8 (1) and (3).

■ The evidence bearing upon the transfer of these employees is long. It would not be helpful to delineate it. The evidence and the reasonable deductions to be drawn from it, presented to the Board the question of fact whether the selection of these particular employees for transfer was due to a necessary reduction in force at the Big Muddy Field, brought about by the change in weekly working schedule, or to their membership in and activities on behalf of the union as a bargaining agency. The Board found the issue against petitioner, the finding is sustained by substantial evidence and therefore cannot be disturbed. National Labor Relations Board v. Waterman Steamship Corporation, supra; Swift & Co. v. National Labor Relations Board,

supra; Southern Colorado Power Co. v. National Labor Relations Board, supra.

 That part of the order commanding reinstatement of the employees is attacked on the ground that the Board failed to find that at the time of the entry of the order either of them was an employee, within the meaning of the act; that the record conclusively establishes that they were not employees; and that for such reason they were not entitled to reinstatement with or without back pay. Section 10 (c) of the Act expressly authorizes the Board to order the reinstatement of employees, with or without back pay, and such power has been upheld. National Labor Relations Board v. Jones & Laughlin Steel Corp., supra; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, supra. Moore obtained employment elsewhere, and Jones engaged in business for himself. But by force of the act an illegally discharged employee or one whose actual work has terminated as the result of wrongful discrimination has a legally protected tenure intermediate his discharge or discrimination and his reinstatement. The act creates a legal right in the employee, and it authorizes the Board as a remedial measure to order reinstatement with back pay. National Labor Relations Board v. J. Greenebaum Tanning Co., 7 Cir., 110 F.2d 984.

 Complaint is also made that the Board ordered restoration of the insurance rights which Moore lost upon termination of his employment. It is provided in section 10(c), supra, that the Board may order one engaging in an unfair labor practice to take such affirmative action as will effectuate the policies of the act. The provision is broad though not unlimited in scope and gives the Board warrant to order any relief which is reasonably adapted to redress wrong. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. MacKay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. It cannot be said that the requirement to restore the insurance rights which the employee lost upon the termination of his employment was not reasonably adapted to the situation.

Petitioner was ordered to make the two employees whole for any loss of pay they may have suffered by reason of its acts by payment to each of them of a sum of money equal to that which he would normally have earned as wages during the period between the termination of his employment and the offer of reinstatement, less his net earnings during that period. Moore has been employed as guard at the penitentiary of Wyoming at a salary of $70 per month and board. Jones purchased and has conducted a general store in Parkerton, Wyoming, and he has been postmaster at that place. No evidence was offered to establish the respective sums necessary to make the two employees whole, and the Board did not fix such sums. If an accounting is necessary it can be had under the direction of the Board, and the Board can then enter a subsequent order fixing the respective amounts.

*Other provisions in the order.*—Predicated in large part upon the postulate that its contentions already considered are correct, petitioner attacks certain provisions in the order as being arbitrary, unwarranted and capricious. Such provisions are authorized by the act and have been given judicial sanction. National Labor Relations Board v. Bradford Dyeing Association, 60 S.Ct. 918, 84 L.Ed. 1226. And in view of the facts, as found by the Board and supported by substantial evidence, it cannot be said that the provisions in question are either arbitrary, unwarranted or capricious, or not reasonably adapted to the situation.

 That part of the order directing the posting of notices stating "that the petitioner will cease and desist as aforesaid" is drawn in question. In Swift & Company v. National Labor Relations Board, supra, this court modified an order of the Board by eliminating a similar provision and substituting other language for it. But since that case was decided, the Supreme Court has expressly approved and directed enforcement of an order containing the identical requirement in question. National Labor Relations Board v. Falk Corporation, 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396. Thus the authority of the Board to require the posting of notices containing such a provision is no longer open to doubt.

The order, insofar as it relates to the Salt Creek Field, will be neither set aside nor enforced. In all other respects it will be enforced.